Opinion issued July 6, 2007



















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00608-CR

NO. 01-06-00609-CR

____________


JARRAD JOSEPH BABINEAUX, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 185th District Court

Harris County, Texas

Trial Court Cause Nos. 1070904 & 1070905






MEMORANDUM OPINION

 A jury found appellant, Jarrad Joseph Babineaux, guilty of the offenses of
aggravated assault on a public servant with a deadly weapon (1) and aggravated
robbery. (2) The jury assessed his punishment at confinement for twenty years and a
$7,500 fine in the aggravated assault case and confinement for fifteen years and a
$7,500 fine in the aggravated robbery case, with the sentences to run concurrently. 
In five issues, appellant contends that the evidence is legally and factually insufficient
to support both of his convictions due to a fatal variance in the indictments and the
evidence which showed that a "CO2 pistol is not a deadly weapon" and to support his
conviction of aggravated robbery as both "complainants denied that a robbery
occurred"; the State engaged in improper jury argument; and his convictions for both
aggravated robbery and aggravated assault violate the Double Jeopardy Clause (3) of the
United States Constitution.

 We affirm.

Factual and Procedural Background

 Jessica Svetlik, an employee at West Southern National Bank, testified that on
September 16, 2005, shortly after 1:00 p.m., as she was sitting at her desk and as
Deputy Cantu, a security guard, was sitting at the officers' station, "two people
[came] running in and screaming." The officers' station is located approximately five
to six feet to the immediate right of Svetlik's desk, with the tellers located in front of
her desk to the far left. Both assailants wore black outfits, and one wore a white
mask. In their hands, one man had a "black gun" and the other man had a "shiny
silver gun." The two men entered the bank through the lobby and ran straight toward
Deputy Cantu's station, yelling, "Give me your gun." Svetlik told the two men to
stop, and they yelled, "No. This is for real." As one of the men stood in front of
Cantu holding the silver gun up against him, the man with the black gun struggled
with Cantu and tried to take his gun. Both kept telling Cantu to give them his gun. 
After the man with the black gun stopped struggling with Cantu, Svetlik put her head
down, said to herself, "I'm going to die here," and then heard two gunshots fired from
within the lobby. When she looked up, she saw Cantu chasing the two men out of the
bank. Svetlik threw her keys to another employee and told him to lock the front door,
while Svetlik called for emergency assistance.

 Svetlik further testified that the only time that the two assailants addressed her
directly was when one of the men said, "This is for real." She explained that the man
with the silver gun stood in front of her and alternated pointing the gun toward her
and Cantu. The entire struggle took place in the area of the officers' station, and
neither assailant approached the teller windows to demand money, either verbally or
in writing, because they were struggling with Cantu. She noted that one weapon was
"black and it looked like a gun" and the other weapon was silver and "very shiny." 
The two shots were fired inside the lobby, and after the shots were fired, the two men
and Cantu ran out of the bank. On the day in question, the bank had $250,000 in its
vault, and the three tellers had $20,000 each.

 Fort Bend Sheriff's Deputy J.A. Cantu testified that he was working an "extra
job" at the bank, sitting at his desk, when he saw "two gentlemen in masks"
approximately "five to ten feet" away from him. Cantu stood up as soon as he saw
the two men and "both of their guns," thinking that "something really bad is about to
happen." One of the men pointed a black gun at Cantu's stomach and demanded
Cantu's gun as he held Cantu's shirt. The other man, with a silver gun, stood to the
right of the man with the black gun. At this point, Cantu did not know that the black
gun was a "BB gun." The man holding Cantu's shirt turned to the other man and
said, "Shoot this mother fucker." Cantu hit the man's hand with his left hand, drew
his weapon, took two steps, pointed his gun at them, and told them to drop their guns. 
Neither of the two men dropped their weapons, and Cantu shot twice. The two men
"took off running" at the same time. Cantu holstered his weapon and told the bank
employees to call for emergency assistance.

 Cantu further testified that the two men veered in different directions. Cantu
followed one of the men, who he later identified as appellant, toward his left. When
the other man went over a fence, Cantu heard a firearm discharge. Eventually, once
Cantu was "pretty close" to appellant, Cantu drew his weapon, ordering him to "get
to the ground," but appellant collapsed. With his firearm drawn, Cantu told appellant
to show him both his hands, and appellant told Cantu that his arm was broken. Once
Cantu saw that appellant did not have anything in his hands, Cantu handcuffed him. 
After appellant told Cantu that he had been shot, Cantu turned him over, patted him
down, and saw that he had been shot. Cantu noted that appellant, who was no longer
wearing a mask, was wearing a black t-shirt, gray pants, and black gloves. Appellant
told Cantu that Cantu had shot him for "no reason." A woman then approached Cantu
and told Cantu that appellant had dropped something behind him. Cantu looked
down and saw a gun. After another officer arrived and appellant's shirt was removed,
Cantu discovered that appellant had two bullet wounds. Cantu also found a trash bag
on appellant. "That's when it really hit [Cantu] that they were really there to rob the
place."

 On cross-examination, Cantu explained that the assailants were inside the bank
for "[m]aybe 15 to 20 seconds" before the shooting occurred. Cantu did not recall
that the assailants said anything to Svetlik. Additionally, he was not aware of the
assailants making any demands for money or other property to any of the bank tellers. 
The only demand that the two assailants made was for Cantu's firearm. He never saw
the assailants point any weapons in a direction other than toward himself, and Cantu
agreed that a robbery did not occur because the assailants did not make any demands
or take any property. However, on re-direct examination, Cantu further testified that
it was not accurate to say that a robbery did not take place because the only reason
that a robbery did not occur was due to Cantu's preventative actions.

 Houston Police Department ("HPD") Officer J.N. Duerer testified that inside
the bank, he found two fired cartridge cases from a .40 caliber Smith & Wesson
Winchester located on the floor near a security desk. In the parking lot outside the
bank, Duerer recovered a mask, described as "like a Halloween mask." HPD Officer
Farmer gave a pistol that he recovered to Duerer. Duerer knew that the pistol was not
a "real weapon" because he was able to fully view the weapon and see the BB clip at
the bottom, which he typically does not see on "real firearms." Duerer explained that,
except for the BB clip, the weapon looked like any other firearm that he had seen.

 HPD Forensic Firearms Laboratory Supervisor M. Lyons testified that he
examined a .40 caliber Glock pistol, a fired bullet jacket, a fired .380 auto cartridge
case, two fired .40 caliber cartridge cases, and a "pneumatic pistol." The official
name for the pneumatic pistol is a "BB gun," also called an "air pistol." Lyons
explained that a "pneumatic pistol or a pneumatic gun uses a compressed gas, not the
result of combustion of powder. In this pistol, the compressed gas is CO2 and not
air." In order to determine whether the weapon was capable of causing serious bodily
injury, he had to determine the potential velocity of a projectile from the weapon. 
Lyons noted that, generally, a velocity of approximately 275 feet per second has the
potential to penetrate skin, but without doing any "specific empirical testing," the
"300 and 350 feet per second range would be sufficient, in [his] opinion, to penetrate
skin." Moreover, "if it can penetrate skin, then it does have the ability to cause
serious bodily injury and potentially death." 

 Lyons tests of the pneumatic pistol with the nine BB's submitted with it
demonstrated an average velocity of 438 feet per second, with a range from 418 to
457 feet per second. After the State gave Lyons the legal definition of a "deadly
weapon" as "[a]nything manifestly designed, made or adapted for the purpose of
inflicting death or serious bodily injury, or anything that in the manner of its intended
use is capable of causing death or serious bodily injury," Lyons stated that, in his
expert opinion, the pneumatic pistol was a deadly weapon. Lyons further explained
that it had the highest velocity that he had measured for this type of weapon. He also
noted that the weapon had a warning label from the manufacturer stating, "Warning. 
Not a toy. Misuse or careless use may cause serious injury or death."

 Lyons further testified that a CO2-powered weapon, such as the one at issue
here, gets its power from compressed CO2 in a "powerlet." He noted that there is a
distinction between a "CO2 pistol" and an "air pistol," in which a pumping action
compresses the gas that provides the pressure necessary to project a BB or a pellet. 
However, Lyons also explained that although the general term for such a weapon is 
"pneumatic gun" and it does not use air, it is very common to refer to such a weapon
as an "air gun."

Sufficiency of the Evidence

 We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We note that
the trier of fact is the sole judge of the weight and credibility of the evidence. 
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the fact finder. 
Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any
inconsistencies in the evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).

 In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury's determination, i.e., that the
verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
are required to afford "due deference" to the jury's determinations. Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

Variance

 In his first issue, appellant argues that "the evidence is insufficient to sustain
a conviction based on the fatal variance between the indictment, trial evidence and
court's charge on the element of a deadly weapon, namely, an 'air pistol.'" Both
indictments, for aggravated robbery and aggravated assault of a public servant,
alleged that appellant used and exhibited an "air pistol." Appellant asserts that a
variance exists because Lyons testified that the gun "was not, as described in the
indictment, an 'air pistol,' but more correctly, a 'CO2 pistol,'" and that there is a
differentiation associated with the nomenclature.

 A "variance" occurs when there is a discrepancy between the allegations in the
charging instrument and the proof at trial. Gollihar v. State, 46 S.W.3d 243, 246
(Tex. Crim. App. 2001). When faced with a legal sufficiency of the evidence claim
based upon a variance between the indictment and the proof, only a "material"
variance will render the evidence insufficient. Id. at 257. A variance between the
wording of an indictment and the evidence presented at trial is fatal only if it is
material and prejudices the defendant's substantial rights. Id. This "materiality"
inquiry requires a determination of whether the variance deprived the defendant of
notice of the charges or whether the variance subjects the defendant to the risk of later
being prosecuted for the same offense. Fuller v. State, 73 S.W.3d 250, 253 (Tex.
Crim. App. 2002).

 Here, it is true that Lyons testified that there is a distinction between a CO2
pistol and an air pistol and that the general term for the weapon in this case is a
"pneumatic gun." However, Lyons also testified that although the weapon does not
use air, it is very commonly referred to as an "air gun" and an "air pistol." 
Furthermore, even assuming that a variance existed between the indictment and the
proof at trial, such a variance would be immaterial. There is no indication in the
record that appellant did not know what weapon he was accused of exhibiting, no
indication that he was surprised by the proof at trial, and, finally, such a variance
would not subject him to another prosecution for the same offense. See Gollihar, 46
S.W.3d at 257; Fuller, 73 S.W.3d at 254. Accordingly, we hold that the term "air
pistol," as used in the indictments, does not render the evidence legally or factually
insufficient to support appellant's convictions.

 We overrule appellant's first issue.

Deadly Weapon

 In his second issue, appellant argues that the evidence is legally and factually
insufficient to support his conviction for both aggravated robbery and aggravated
assault on a public servant because "the CO2 pistol is not a deadly weapon." A deadly
weapon includes "anything that in the manner of its use or intended use is capable of
causing death or serious bodily injury." Tex. Pen. Code Ann. § 1.07(a)(17)(B)
(Vernon Supp. 2006). In support of his argument, appellant asserts that "[t]he State's
own firearms expert did not say it was loaded"; "there is no evidence that the airgun
was loaded"; "[t]he firearms expert testified that the BB's submitted to him by police
were not in the weapon, but merely with the weapon"; and "[t]here was no testimony
that the BB gun contained any live rounds of pellets."

 However, the Texas Court of Criminal Appeals has held that whether a
defendant's BB gun is loaded or unloaded is not significant in the analysis. Adame
v. State, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002). In Adame, the defendant
pointed a BB gun at a store clerk and demanded money. Id. at 581. A police
investigator testified that the BB gun could cause serious bodily injury if it were
pointed and fired at someone. Id. In finding the evidence insufficient to support the
jury's deadly weapon finding, the Waco Court of Appeals found it significant in its
deadly weapon analysis whether the defendant's BB gun was loaded or unloaded. Id. 
The Court of Criminal Appeals, however, noted that what is significant is whether a
defendant's BB gun is capable of causing serious bodily injury:

It is not necessary, however, to place an additional evidentiary burden
on the State to affirmatively prove that a BB gun, which is not a deadly
weapon per se, was loaded at the time of the commission of the offense. 
Rather, in proving use of a deadly weapon other than a deadly weapon
per se, the State need show only that the weapon used was capable of
causing serious bodily injury or death in its use or intended use.


Id. at 582. Accordingly, the court held that the evidence that the defendant displayed
the BB gun to the convenience store clerk and that the gun was capable of causing
serious bodily injury if pointed and fired at someone was sufficient to support the
jury's deadly weapon finding. Id. 

 Here, the State did not affirmatively prove that the CO2 weapon was loaded at
the time of the commission of the offenses. However, as noted above, the State was
not required to prove that the weapon was loaded. See id. Additionally, Lyons
testified that when he tested the CO2 weapon, he found an average velocity of 438
feet per second, with a range from 418 to 457 feet per second, far exceeding a
velocity capable of penetrating the skin. After the State provided Lyons with the
legal definition of a deadly weapon, Lyons stated that, in his expert opinion, the air
pistol was a deadly weapon, capable of causing serious bodily injury or death. 
Additionally, he read the manufacturer's warning label which stated, "Warning. Not
a toy. Misuse or careless use may cause serious injury or death." Accordingly, we
hold that the evidence is legally and factually sufficient to support the jury's finding
that appellant used or exhibited a deadly weapon during the commission of the
offenses.

 We overrule appellant's second issue. 

Aggravated Robbery

 In his third issue, appellant argues that the evidence is legally and factually
insufficient to support his conviction for aggravated robbery, or alternatively,
robbery, because Deputy Cantu "admitted that neither man demanded money or other
property other than Cantu's gun," nothing was taken from the bank, and Svetlik
"admitted that neither man demanded any money or any other property, verbally or
in writing, from her or any other person at any point during the event." Appellant
asserts that it cannot "simply be inferred that a robbery occurred when the State's own
witnesses testified that a robbery never occurred and that there were no demands for
money or property as alleged in the indictment."

 A person commits the offense of robbery if, in the course of committing theft
and with intent to obtain or maintain control of the property, he intentionally or
knowingly threatens or places another in fear of imminent bodily injury or death. 
Tex. Pen. Code Ann. § 29.02(a)(2) (Vernon 2003). A person commits the offense
of aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. 
Id. § 29.03(a)(2) (Vernon 2003). "In the course of committing theft" means conduct
that occurs in an attempt to commit, during the commission, or in immediate flight
after the attempt or commission of theft. Id. § 29.01(1) (Vernon 2003). Proof of a
completed theft is not required to establish the underlying offense of robbery. 
Bustamante v. State, 106 S.W.3d 738, 740 (Tex. Crim. App. 2003). While an intent
to steal must be shown in order to prove an attempted theft, this intent may be
inferred from circumstantial evidence. Wolfe v. State, 917 S.W.2d 270, 275 (Tex.
Crim. App. 1996).

 Here, viewing the evidence in a light most favorable to the verdict, Svetlik
testified that two men, both wearing masks and carrying guns, came into the bank
lobby running and screaming. One of the suspects yelled at Cantu, stationed at the
officers' desk, to give them his gun and told Svetlik, "This is for real." Svetlik
additionally testified that there was $310,000 in cash on hand at the bank. Cantu
testified that while appellant was holding a gun to his stomach, the other assailant was
also brandishing a firearm. Moreover, when Cantu was finally able to apprehend
appellant, he found a trash bag on appellant, leading Cantu to the conclusion that
"they were really there to rob the place." We conclude that a rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. 
Accordingly, we hold that the evidence is legally sufficient to support appellant's
conviction for the offense of aggravated robbery.

 Viewing the evidence neutrally, it is true that Svetlik testified that at no time
did either of the assailants approach anyone demanding money, either verbally or in
writing, and that the only demand the assailants made was for Cantu's firearm. 
Additionally, Cantu agreed that no robbery took place because the assailants did not
make any demands or take any property. However, we again note that proof of a
completed theft is not required to establish the underlying offense of robbery and,
while an intent to steal must be shown in order to prove an attempted theft, this intent
may be inferred from circumstantial evidence. Wolfe, 917 S.W.2d at 275. Here, the
jury may have rationally inferred that appellant and the other assailant were there to
rob the bank, but were foiled by Deputy Cantu's actions. We conclude that the
evidence is not so obviously weak such that the verdict seems clearly wrong and
manifestly unjust, or that the proof of guilt is against the great weight and
preponderance of the evidence. Accordingly, we hold that the evidence is factually
sufficient to support appellant's conviction for the offense of aggravated robbery.

 We overrule appellant's third issue.

Improper Jury Argument

 In his fourth issue, appellant argues that the State "erred during argument by
misstating the law, advising the jury that [it] didn't have to prove all the elements in
the indictment to sustain a conviction, namely, that [it] did not have to prove what
type of gun was used in the commission of the offense." 

 Appellant complains of the following argument:

[State]: [Appellant's counsel] is going to get up and say, "The
State, you know what they proved? They pled it as an air
pistol. But know what they proved, they proved it was a
CO2 pistol." 


 Let me tell you what; that don't fly. Okay?


 Because when we plead these cases, we plead them in
generalities.


After appellant made his closing argument, the State rebutted, "I don't have to
prove--I have to prove a firearm. I don't have to prove that it's a .38 or a .45. I just
got to prove that it's a firearm." (4)

 Generally, there are four permissible areas of jury argument: (1) summation of
the evidence; (2) reasonable deductions from the evidence; (3) answers to the
argument of opposing counsel; and (4) pleas for law enforcement. Thompson v. State,
89 S.W.3d 843, 850 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd). 

 Appellant concedes that "there was no objection despite the prosecutor's
repeated misstatement of the law during argument," but argues that "the Court of
Appeals may still reverse for unobjected-to argument error." However, the Texas
Court of Criminal Appeals has held that a defendant's failure to object to a jury
argument forfeits the right to complain about the argument on appeal. See, e.g.,
Threadgill v. State, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (noting that in
Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996), court expressly
overruled precedent allowing defendant to complain, for first time on appeal, about
unobjected-to erroneous jury argument that was so prejudicial it could not have been
cured by instruction to disregard).

 Here, appellant did not object to the State's argument. Accordingly, we hold
that appellant has waived any error regarding the State's jury argument. See Tex. R.
App. P. 33.1.

 We overrule appellant's fourth issue.

Double Jeopardy

 In his fifth issue, appellant argues that "error occurred and appellant's double
jeopardy rights under the Fifth Amendment of the U.S. Constitution were violated by
his convictions for both aggravated robbery and aggravated assault because
aggravated assault is a lesser[-]included offense of the aggravated [robbery]."

 In regard to aggravated robbery, the indictment alleges that appellant,

. . . heretofore on or about September 16, 2005, did then and there
unlawfully, while in the course of committing theft of property owned
by Jessica Svetlick [sic] and with intent to obtain and maintain control
of the property, intentionally and knowingly threaten and place Johnny
Cantu in fear of imminent bodily injury and death, and the Defendant
did then and there use and exhibit a deadly weapon, to wit: an Air Pistol.


 In regard to aggravated assault on a public servant, the indictment alleges that
appellant,

. . . heretofore on or about September 16, 2005, did then and there
unlawfully, intentionally and knowingly threaten with imminent bodily
injury Johnny Cantu, hereafter called the Complainant, while the
Complainant was lawfully discharging an official duty, by using and
exhibiting a deadly weapon, namely An Airpistol, knowing that the
Complainant was a public servant. (5)


 The Double Jeopardy Clause of the U.S. Constitution provides that "[n]o
person shall . . . be subject for the same offence to be twice put in jeopardy of life or
limb." See U.S. Const. amend V. The Double Jeopardy Clause prohibits the State
from prosecuting a defendant for any lesser offense included within the offense
alleged in the indictment, since, for purposes of the Clause, a greater offense and a
lesser included offense are "the same offence." Ex parte Goodman, 152 S.W.3d 67,
71 (Tex. Crim. App. 2004) (citing Brown v. Ohio, 432 U.S. 161, 168, 97 S. Ct. 2221,
2226 (1977)). In Blockburger v. United States, the Supreme Court set forth the test
for determining whether two offenses constitute the same offense for purposes of the
Double Jeopardy Clause:

The applicable rule is that, where the same act or transaction constitutes
a violation of two distinct statutory provisions, the test to be applied to
determine whether there are two offenses or only one, is whether each
provision requires proof of a fact which the other does not.


. . . .


A single act may be an offense against two statutes; and if each statute
requires proof of an additional fact which the other does not, an acquittal
or conviction under either statute does not exempt the defendant from
prosecution and punishment under the other.


284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932) (citations omitted).

 Under the Texas Code of Criminal Procedure, an offense is a lesser-included
offense if,

(1) it is established by proof of the same or less than all the facts
required to establish the commission of the offense charged;


(2) it differs from the offense charged only in the respect that a less
serious injury or risk of injury to the same person, property, or
public interest suffices to establish its commission;


(3) it differs from the offense charged only in the respect that a less
culpable mental state suffices to establish its commission; or


(4) it consists of an attempt to commit the offense charged or an
otherwise included offense.


Tex. Crim. Proc. Ann. art. 37.09 (Vernon 2006). 

 The Texas Court of Criminal Appeals has recently clarified the method for
determining whether the allegation of a greater offense includes a lesser offense. See
Hall v. State, No. PD-1594-02, 2007 WL 1343110, at *1 (Tex. Crim. App. May 9,
2007). The court phrased the issue as "whether 'the facts required' in Article
37.09(1) are determined by the evidence adduced at trial, or whether the
determination is a question of law that can be answered before the trial begins by
looking at the elements and facts alleged in the charging instrument." Id. at *5. The
court held that the "pleadings" approach is the sole test for determining in the first
step whether a party may be entitled to a lesser-included offense instruction. Id. at
*8. In describing the "cognate-pleadings" approach, the court stated that a court
"looks to the facts and elements as alleged in the charging instrument, and not just to
the statutory elements of the offense, to determine whether there exists a lesser-included offense of the greater charged offense." Id. at *1. The availability of a
lesser-included instruction in a given case depends on the second step, whether there
is some evidence adduced at trial to support such an instruction. Id. at *8.

 The first step in the lesser-included offense analysis, determining whether an
offense is a lesser-included offense of the alleged offense, is a question of law. Id. 
It does not depend on the evidence to be produced at the trial. Id. It may be, and to
provide notice to the defendant must be, capable of being performed before trial by
comparing the elements of the offense as they are alleged in the indictment or
information with the elements of the potential lesser-included offense. Id.

 The evidence adduced at trial should remain an important part of the trial
court's decision whether to charge the jury on lesser-included offenses. Id. at *9. 
The second step in the analysis should ask whether there is evidence that supports
giving the instruction to the jury. Id. A defendant is entitled to an instruction on a
lesser-included offense where the proof for the offense charged includes the proof
necessary to establish the lesser-included offense and there is some evidence in the
record that would permit a jury rationally to find that if the defendant is guilty, he is
guilty only of the lesser-included offense. Id. In this step of the analysis, anything
more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser
charge. Id. In other words, the evidence must establish the lesser-included offense
as "a valid, rational alternative to the charged offense." Id.

 Here, appellant contends that the aggravated assault of Deputy Cantu is a
lesser-included offense of aggravated robbery. Applying the first step of the lesser
included-offense analysis, we do not consider the evidence that was presented at trial. 
Instead, we consider only the statutory elements of attempted robbery as they were
modified by the particular allegations in the indictment:

(1) appellant;


(2) unlawfully, while in the course of committing theft of property
owned by Jessica Svetlik and with intent to obtain and maintain
control of the property;


(3) intentionally and knowingly threatened and placed Johnny Cantu
in fear of imminent bodily injury and death;


(4) by using and exhibiting a deadly weapon, to wit: an Air Pistol.


 We then compare these elements with the elements of the offense of aggravated
assault on a public servant:

(1) appellant; 


(2) intentionally or knowingly threatens another with imminent
bodily injury; 


(3) using or exhibiting a deadly weapon during the commission of the
offense; and


(4) the offense is committed against a person the actor knows is a
public servant while the public servant is lawfully discharging an
official duty.


See Tex. Pen. Code Ann. §§ 22.01(a)(2), 22.02(a)(2), 22.02(b)(2)(B). 

 We then ask the question that article 37.09(1) poses: are the elements of the
purported lesser offense "established by proof of the same or less than all the facts
required to establish the commission of the offense charged?" Here, the answer is no. 
The facts required to prove an aggravated assault on a public servant are not the same
as, or less than, those required to prove an aggravated robbery. Specifically, the
offense of aggravated assault on a public servant requires proof that the offense was
committed against a person the actor knew was a public servant while the public
servant was lawfully discharging an official duty. Id. § 22.02(b)(2)(B). The offense
of aggravated assault on a public servant is not a lesser-included offense of the
offense of aggravated robbery. Accordingly, we hold that the prosecution of
appellant for both the offenses of aggravated robbery and aggravated assault on a
public servant did not violate the Double Jeopardy Clause of the U.S. Constitution.

 We overrule appellant's fifth issue.

Conclusion

 We affirm the judgments of the trial court.



 Terry Jennings

 Justice


Panel consists of Justices Taft, Jennings, and Alcala.


Do not publish. Tex. R. App. P. 47.2(b). 
1. See Tex. Pen. Code Ann. §§ 22.01(a)(2), 22.02(a)(2), 22.02(b)(2)(B) (Vernon Supp.
2006). Appellate Cause Number 01-06-00608-CR; Trial Court Cause Number
1070905.
2. See id. §§ 29.02(a)(2), 29.03(a)(2) (Vernon 2003). Appellate Cause Number 01-06-00609-CR; Trial Court Cause Number 1070904.
3. See U.S. Const. amend. V.
4. In his brief, appellant asks this Court to "follow Robledo . . . and reverse his
conviction based on the prosecutor's improper argument." Appellant does not
provide a citation to this purported authority.
5. A person commits the offense of aggravated assault on a public servant if the person
intentionally or knowingly threatens another with imminent bodily injury and the
person uses or exhibits a deadly weapon during the commission of the offense, and
the offense is committed against a person the actor knows is a public servant while
the public servant is lawfully discharging an official duty. See Tex. Pen. Code Ann.
§§ 22.01(a)(2), 22.02(a)(2), 22.02(b)(2)(B).