Megan WINFREY a/k/a Megan Winfrey Hammond, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–09–00043–CR.

Court of Appeals of Texas, Beaumont.

Submitted Oct. 25, 2010.

Decided April 6, 2011.

Scott H. Pawgan, Huntsville, for appellant.

Bill Burnett, Crim. Dist. Atty., Coldspring, for state.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

DAVID GAULTNEY, Justice.

Megan Winfrey a/k/a Megan Winfrey Hammond appeals her convictions for capital murder and conspiracy to commit capital murder. She asserts there is insufficient evidence to support the jury's verdict. Viewed in the light most favorable to the verdict, the evidence supports the jury's decision. We affirm the judgment.

### THE EVIDENCE

Murray Wayne Burr was found murdered in his home. He suffered twenty-five stab wounds, primarily in the head and neck area, and multiple sharp and blunt-force injuries. Burr had extensive craniofacial fracturing, including a broken right eye orbit and broken jaw bone. His body had been dragged from the living room to the master bedroom where his throat was cut. There was no evidence of forced entry into the house or of a long-term struggle. Burr's wallet was on the washing machine. The only item investigators initially believed to be missing was a Bible, but they later determined—from a statement made by Megan Winfrey's father to another inmate, and then from a relative of Burr's—that Burr owned two guns which were missing.

At the time of the murder in August 2004, Winfrey was sixteen years old. She lived near Burr. Burr worked as a janitor at the high school where Winfrey attended. According to trial testimony, Burr was cognitively "slow in some areas" but "intelligent in [some.]"

Texas Ranger Grover Huff interviewed Winfrey. According to Huff, Winfrey stated that she had last seen Burr two weeks prior to his death. Winfrey denied any inappropriate contact between her and Burr. She admitted she may have commented to people that Burr had a nice home or nice things in his home, but she denied making any comments about Burr having money hidden in his house. Winfrey denied any involvement in his death.

Ranger Huff testified that during the interview, he began questioning Winfrey about some discrepancies in her statements and about some comments she made about having an ability to exercise control over men. According to Huff, Winfrey then appeared "to be frustrated or . . . somewhat angry and excused herself from the interview[.]"

None of the hair, blood, or DNA collected from the scene could be matched to Winfrey or her family members. The DNA profile that did not relate to Burr was unknown.

To assist in the investigation, Huff contacted Deputy Keith Pikett, a dog handler with the Fort Bend County Sheriff's office. Pikett used bloodhounds trained to perform "dog-scent lineups." Pikett performed a dog-scent lineup with Winfrey's scent sample in August 2004. Pikett used two bloodhounds to perform the lineup. The lineup involved scent samples obtained from the clothes Burr was wearing at the time of the murder and scent samples from six females, including Megan Winfrey. The dogs were "pre-scented" on the scent obtained from Burr's clothing and then walked by a line of paint cans that each contained one of the six female scents. The jury viewed a video showing both dogs alerting to the can containing Megan Winfrey's scent. An "alert" occurs when the dog matches the scent from the

victim's scent pad to the scent pad obtained from the suspect.

Pikett also performed a scent lineup with scent pads obtained from Richard Winfrey, Jr. (appellant's brother) and other males. Pikett testified that both dogs alerted to the scent of Richard Winfrey, Jr., and the jury viewed a video of the dog-scent lineup. Based on the alerts by the dogs, Pikett concluded that Megan Winfrey and Richard Winfrey, Jr. had contact with the clothes Burr was wearing at the time of the murder. On cross-examination, Pikett agreed that a person's scent could be transferred to another person indirectly even when the two persons "have not had direct personal contact."

In July 2006, the San Jacinto County Sheriff's Department received new information about the case from David Campbell, an inmate in the Montgomery County Jail. Campbell testified that in the summer of 2006, he shared a cell in the county jail with Richard Winfrey, Sr., Megan's father. Winfrey, Sr. was out on parole at the time of the murder of Burr. Campbell got the impression from talking with Winfrey, Sr. that Winfrey, Sr. may have some knowledge or involvement in the murder. According to Campbell, the only way for someone to know what Winfrey, Sr. purported to know about the murder was to have been there when the murder occurred.

Campbell testified:

Q. Did Richard, Sr. have concerns about Richard, Jr., breaking?

A. He would be the first to speak, yes.

Q. So there was an indication from Richard Winfrey, Sr., that it was the kids that allowed access to be gained to the house; is that correct?

A. Not kids. He just said one of them.

Q. One of them?

A. He didn't say which one.

Q. But did he indicate both were there, and it was one of them that let him in?

A. That let him in? He didn't say exactly let him in. He just said—

Q. Allowed him to gain access?

A. Access. I mean, that's hearsay. I mean—

Winfrey, Sr. told Campbell that Burr had been "[s]tabbed repeatedly[,]" and also said that "[a] couple of antique guns" were taken from the house. Prior to interviewing Campbell, law enforcement investigators were not aware that any guns were missing from Burr's home. Investigators subsequently interviewed Burr's brother-in-law, who confirmed that Burr owned two guns that the family could not locate following his death.

Campbell also testified that Winfrey, Sr. bragged that Burr's penis had been mutilated; this statement regarding the crime was inaccurate. According to Campbell, Winfrey, Sr. was "[v]ery concerned" that Megan Winfrey or Richard Winfrey, Jr. would be held responsible for the murder, and he repeatedly stated that they were not responsible.

In August 2007, Pikett was asked to perform another "dog-scent lineup" using the scent of Richard Winfrey, Sr. The jury saw a video of this lineup. All three dogs used in the lineup alerted to the paint can with Winfrey, Sr.'s scent. Pikett testified that, based on the scent lineup, Winfrey, Sr.'s scent was also on the victim's clothing.

Detective Katherine Wick with the San Jacinto County Sheriff's Department testified that she attempted to obtain a pubic hair sample from Megan Winfrey. Winfrey had shaved her pubic area "that morning" and Wick was unable to obtain the sample. According to Wick, Winfrey "made the comment that her brother had

called her and stated that [the sheriff's department was] harassing him and that he was mad." Wick advised Winfrey that she would attempt to obtain a sample at a later time and that shaving prior to that time would constitute a violation of the court's order. Wick subsequently obtained a pubic hair sample from Winfrey. The sample did not match a hair recovered from the scene.

Jason King, Winfrey's ex-boyfriend, testified that he contacted the San Jacinto County Sheriff's Department because he was "told some things" by Winfrey that he "needed to get off [his] chest." At that time, he had moved to another state and had married. King testified concerning what Megan Winfrey told him:

Q. And these comments related to the murder of Murray Burr?

A. Yes, sir.

Q. Did Megan indicate any reason why they would go to Murray Burr's?

A. She told me that they used to take him to church. They would pick him up and take him to church.

Q. Did she indicate why they would do anything to Murray or why they went over there to the house?

A. Her words were it was an easy lick.

Q. And what did you take "easy lick" to mean?

A. I guess—

Q. Did they think they would get money?

A. I think so.

Q. Were you present when Megan received a phone call from her little brother or one of the family members—

A. The day—

Q. —or her older brother?

A. —when he was arrested?

Q. Yes.

A. Yes, sir.

Q. Okay. What did—what did Megan do when she got that phone call?

A. Had me take her to Chris Hammond's mobile home.

Q. And what did she say was the purpose of going over there?

A. That it had something to do with Danielle. When we got there, the only thing that was said was we were at a concert that night.

Q. So they—she and—this was Chris Hammond?

A. Yes, sir.

Q. Who was Chris Hammond?

A. Megan's ex-husband.

Q. And so, the only thing they talked about was an alibi?

A. Yes, sir.

Q. And prior to that, to your knowledge, did Megan receive information that a search warrant was going to be conducted regarding pubic hair?

A. Yes, sir.

Q. Okay. Do you know—did she get a phone call?

A. I can't tell you, sir.

Q. Okay. Do you know what she did when she got that information?

A. Yes, sir.

Q. What did she do?

A. She shaved herself.

Q. And since you were having sexual relations with her, you were aware of that?

A. Yes, sir.

Q. Okay. And she remained shaved for a period of time?

A. Yes, sir.

Q. Okay. Did she indicate anything else regarding the murder of Murray Burr?

A. No, sir. All she said was it was an easy lick.

Winfrey and Christopher Hammond had been dating for "about five months" at the time of the murder. A "dog-scent lineup" was performed with a scent pad from Christopher Hammond, but the dogs did not alert to his scent. Two of his shoe laces were admitted; a report stated blood was found on one shoe string. Hammond and Winfrey married, had a child together, and were divorced before trial. Winfrey called Hammond's mother on the morning of the last day of the State's case to ask whether Hammond was going to testify. Hammond did not testify at trial.

Karen Robertson, a teacher from Winfrey's high school, testified regarding a statement made by Megan Winfrey during summer school approximately a month before the murder. Robertson testified that while Burr was working as a janitor, Winfrey saw him in the hall and "jumped up . . . and grabbed him by the arm and said, 'Oh, Murray, Murray, when are you going to take me out and spend some of that money that you have? We know you have that money hid at home.'" According to Robertson, Burr looked embarrassed and "went on about his business[.]"

Debra King (not related to Jason King), a teacher at Winfrey's school in 2003 and 2004, testified she observed Megan Winfrey having a conversation with Burr in the school hallway. King testified that she could not hear the contents of the conversation, but as Burr turned away, Winfrey "cl[e]nched her fist and said, '[s]omebody should beat the s* * * out of him.'" Winfrey looked "very angry" and Burr looked distraught, saddened, or "like he really didn't understand." King testified that Winfrey then followed King into her classroom and apologized. Winfrey told King that she "didn't mean to say that aloud[,]"

and explained that "[s]he lived near [Burr] and was just tired of all his cats."

Megan Winfrey testified that she had nothing to do with the murder, and did not know who murdered Burr. Winfrey testified that she and her brother would drive past Burr's residence on their way to church and "would see [Burr] outside in his yard, and we would stop by and see him to see if he wanted to go to church[.]" According to Winfrey, Burr "would always say, '[t]ry next weekend.'" She and her brother visited Burr at his residence occasionally, and she was last there "anywhere from two weeks to a month" before his death. They "talked about everything[,]" but nothing "too [ ] memorable." Winfrey explained that she sat on his furniture and had casual physical contact with Burr, a hand shake or hug.

Winfrey stated she was at the Burr residence "probably a handful of times, maybe four or five or six" times during the summer before the murder. She also saw Burr when he was working at school. When asked if it was her understanding that Burr had a lot of money, Winfrey stated, "No. He was a janitor." Winfrey testified that she was not aware that Burr owned any guns until she was charged with the offense. Winfrey explained that when she became a suspect in the case, she cooperated with authorities by voluntarily submitting a buccal swab, fingerprints, scent evidence, and giving nearly a two-hour statement. She explained that she had a regular habit of shaving her pubic hair and did not shave to avoid giving a sample.

Winfrey did not completely dispute the testimony of Karen Robertson. Winfrey admitted that she made the statement to Burr, but "[n]ot those exact words." She testified that she did not say anything about Burr's money or him having money hidden at his house, and she characterized

that part of Robertson's testimony as "a little exaggerated."

Winfrey did not recall making the statement testified to by Debra King. When asked if she said she thought Burr may have been killed because he was bragging about money to other people, Winfrey testified that Burr said "he was getting a retirement check or something." Winfrey testified, "Yeah, I guess I said that, yeah. If it says I said that, then, yes, I said that." Regarding Ranger Huff's testimony about her claim to control men, Winfrey admitted that she had made that statement, explaining that she was "16 and immature."

Winfrey denied that she said Burr was "an easy lick." She did not know what that term meant but she believed it to be drug-related, "like selling drugs or picking up drugs or something to that nature." In response to Jason King's testimony that Winfrey shaved because she learned her brother had been served with a warrant for pubic hair, Winfrey responded that she was not dating King at that time. Winfrey testified that when King asked her why the sheriff's department was accusing her of the crime, she told King that someone said the reason he felt she was guilty was because she shaved her pubic hair after obtaining information about the warrant.

Winfrey agreed that Jason King's testimony regarding her conversation with Hammond the day her brother was arrested was "true," but viewed "out of context[.]" According to Winfrey, when investigators questioned her regarding the murder, they asked her where she was the night before, and she said she was at a concert. Winfrey testified that her conversation with Hammond was, " 'Chris, how can they do this? We were at a concert[,]' " and the conversation was not an attempt to establish a false alibi. Winfrey testified that when her brother was arrested, she asked King to take her to Hammond. She knew she was also being investigated and she wanted to make arrangements for Hammond to watch her daughter in the event that she was arrested.

Winfrey testified that her father was paroled nine days before the murder. When asked to explain why her father's scent would be on the clothes Burr was wearing at the time of the murder, she suggested she could have transferred her father's scent to Burr's residence. When it was noted that she had previously stated she had not seen Burr during the two weeks preceding his murder, and her father had only been out on parole for nine days, she stated that "[she] had never thought of that."

## STANDARD OF REVIEW

In four issues, Winfrey argues the evidence is insufficient to support her convictions. In a sufficiency review, an appellate court must view all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). This Court must give deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Klein v. State*, 273 S.W.3d 297, 302 (Tex. Crim.App.2008) (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781). We must " 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.' " *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007) (quoting

*Hooper,* 214 S.W.3d at 16–17). "[T]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State,* 323 S.W.3d 893, 895 (Tex.Crim.App.2010).

"On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Hooper,* 214 S.W.3d at 13. It is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the cumulative force of all the incriminating evidence. *Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App.1993).

## THE OFFENSES

A person commits the offense of murder if she "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). She commits a capital murder offense when she "intentionally commits the murder in the course of committing or attempting to commit ... robbery ... [.]" *Id.* § 19.03(a)(2) (West Supp. 2010). The State need not prove that the defendant completed the theft of the victim to establish the underlying offense of robbery or attempted robbery. *Bustamante v. State,* 106 S.W.3d 738, 740 (Tex.Crim.App.2003). The requisite intent to rob may be inferred from circumstantial evidence. *Id.* at 740–41; *see also Alvarado v. State,* 912 S.W.2d 199, 207 (Tex.Crim.App.1995).

A person commits criminal conspiracy if, with the intent that a felony be committed, (1) he or she agrees with one or more persons that they engage in conduct that would constitute the offense and (2) he or she or one or more of them performs an overt act in pursuance of the agreement.

Tex. Penal Code Ann. § 15.02(a) (West 2003). "An agreement constituting a conspiracy may be inferred from acts of the parties." *Id.* § 15.02(b).

## "DOG-SCENT LINEUP" EVIDENCE

In *Richard Lynn Winfrey v. State,* 323 S.W.3d 875, 884–85 (Tex.Crim.App.2010), the Court of Criminal Appeals stated that "while [dog-scent lineup] evidence may raise a strong suspicion of appellant's guilt, we nevertheless decide that, standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt." The Court stated that, " '[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence.' " *Id.* at 884 (quoting *State v. Loucks,* 98 Wash.2d 563, 656 P.2d 480, 483 (Wash.1983)). Therefore, "when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive." *Id.* at 884. As in that case, Megan Winfrey did not object to the evidence at trial, so this Court does not have "an occasion to review or determine the admissibility of that evidence under either *Kelly v. State* [824 S.W.2d 568 (Tex.Crim.App.1992)] or *Nenno v. State* [970 S.W.2d 549 (Tex.Crim.App.1998)]." *See id.* at 885 (Cochran, J., concurring). Nevertheless, the dog-scent lineup evidence is insufficient to establish Megan Winfrey's guilt beyond a reasonable doubt, and we set it aside from our sufficiency review.

## SUFFICIENCY REVIEW

In reviewing the sufficiency of the evidence, "we should look at 'events occurring before, during[,] and after the commission of the offense[.]' " *Hooper,* 214 S.W.3d at 13 (quoting *Cordova v. State,* 698 S.W.2d 107, 111 (Tex.Crim.App. 1985)). The Court of Criminal Appeals has noted that "[c]ircumstantial evidence is

as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*

■■■ "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. "[A] court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781; *see also Brooks,* 323 S.W.3d at 895 (The *Jackson v. Virginia* legal sufficiency standard is the applicable standard of review.). "[A] reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the *sole* judge of the witnesses' credibility and the weight to be given their testimony." *See Brooks,* 323 S.W.3d at 899.

### THE CRIME SCENE

Winfrey points to the lack of any DNA or other physical evidence connecting her to the murder, but the lack of that type of evidence does not necessarily render the evidence presented to the jury insufficient to support the jury's verdict. *See Tinker v. State,* 148 S.W.3d 666, 669 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Ranger Huff testified that it would not be unusual for hairs collected from a crime scene to be unrelated to a suspect or anyone who was at the crime scene. Burr worked as a school custodian, and he most likely came into contact with hairs from the school that could easily be carried home on his shoes or clothing. Huff explained that in most of his murder investigations he consistently finds DNA evidence, but he does not consistently find DNA evidence that links a particular suspect to the scene. When asked if he typically finds fingerprints that identify the suspects, he responded: "[A]bsolutely not. It's a very rare occurrence, in my experience, to find fingerprints linking a suspect to a scene. We often don't find fingerprints at all." He stated that if the suspects have time to flee the scene and dispose of evidence, and in most cases they do, it would not be unusual if shoes, bloody clothes, fingerprints of the suspect, or DNA tying the suspect to the crime were not recovered.

### MEGAN WINFREY'S STATEMENTS AND CONDUCT

■■ Jason King testified that Megan Winfrey made "comments and stuff" "[u]sually when we were partying." She stated "regarding the murder" that Burr "was an easy lick." Jason King was asked, "Did she indicate why they would do anything to Murray or why they went over there to the house[,]" and he said: "Her words were it was an easy lick." Winfrey denied making this statement. The jury determines the credibility of the witnesses and resolves conflicts in the testimony. *See Brooks,* 323 S.W.3d at 899. A rational juror could conclude that Winfrey did make the statement, and that it implicated her in the crime.

Jason King testified that on the day Winfrey's brother was arrested, Winfrey had a conversation with Hammond regarding their attendance at a concert. King understood the conversation as an attempt to establish an alibi. Winfrey testified that she told the officers who interviewed her that she had been at a concert. Burr was last seen on the evening of August 6, 2004. Burr's body was discovered early on the morning of August 8, 2004. Ranger

Huff determined that the concert to which Megan referred took place the night of August 8, 2004, and said Winfrey used the concert as an explanation for an injury to Hammond's chin. A rational factfinder could infer Winfrey met with Hammond to assure his explanation would be the same as hers. Her belief that a meeting with Hammond was necessary to ensure that their accounts matched could be viewed by a rational factfinder as indicating a concern that his explanation might be different.

According to Karen Robertson, Megan Winfrey told Burr that she knew he had money hidden at his house. Winfrey admitted she said Burr may have been killed because he bragged about money. A rational factfinder could reasonably infer Megan Winfrey thought Burr had "that money hid at home," and thought the hidden money was the motive for his murder. Burr suffered stab wounds and multiple sharp and blunt-force injuries. A rational factfinder could reason that the motive was "that money hid at home," and that the multiple inflictions of pain executed in separate areas of Burr's house were not inconsistent with the attempt to learn where the money was hidden.

Debra King testified Winfrey very angrily said someone "should beat the s* * * out of [Burr]." A rational factfinder could conclude from this statement, and from her clenched fist when she made it, that Winfrey was very angry at Burr and wanted Burr badly hurt.

Two witnesses testified Winfrey shaved when she knew a pubic hair sample would be requested by the investigators. The jury is the sole judge of the credibility of the witnesses, and could disbelieve Winfrey's explanation. A rational juror could conclude Winfrey tried to avoid providing evidence she feared might implicate her. *See Wincott v. State,* 59 S.W.3d 691, 702 (Tex.App.-Austin 2001, pet. ref'd) (A defendant's conduct may indicate consciousness of guilt.).

## CAMPBELL'S TESTIMONY

Campbell testified as follows:

Q: [State] And did [Winfrey, Sr.] ever indicate that he had been present or knew what may have happened in that murder or did you get that impression?

A: [Campbell] I got that impression after him talking over and over. The things that he was saying that the only way he would be able to know exactly what he was saying would have been to put him at the murder.

. . . .

Q: [State] Did Richard Winfrey, Sr. indicate that the kids had something to do with him getting into the house?

. . . .

A: [Campbell] Yes.

Q: [State] And what did he convey to you?

A: [Campbell] That his children—that [Burr] was a janitor at their school; that they frequently would go over there and visit with Richard; and one of them they used—one of them, when he got out of wherever he was at, they went to this house and was supposed to have opened a door or window. I don't know if it was a door or the window in the back of his house.

Q: [State] For him to gain access?

A: [Campbell] Right.

. . . .

Q: [State] Did he indicate any particular concerns regarding his son, Richard, Jr.?

A: [Campbell] That was his biggest concern the whole time I was there.... It was the well-being of his children, Megan and Richard, both, that they was going to be framed for something they didn't do.

Q: [State] Did [Winfrey, Sr.], have concerns about Richard, Jr., breaking?

A: [Campbell] He would be the first to speak, yes.

Q: [State] So there was an indication from [Winfrey, Sr.] that it was the kids that allowed access to be gained to the house, is that correct?

A: [Campbell] Not kids. He just said one of them.

Q: [State] One of them?

A: [Campbell] He didn't say which one.

Q: [State] But did he indicate both were there, and it was one of them that let him in?

A: [Campbell] That let him in? He didn't say exactly let him in. He just said—

Q: [State] Allowed him to gain access?

A: [Campbell] Access. I mean, that's hearsay. I mean—

Q: [State] Yeah. Okay. Now, you appear nervous.

A: [Campbell] Well, I am. I mean, I don't—I don't know Megan. I have never met her. I mean, everything that you are asking me is hearsay to this trial. You know, I—

Campbell testified as follows on cross-examination:

Q: [Defense] All right. And I think you said earlier he was concerned about his children would be framed. I think that was your exact words?

A: [Campbell] Exact words.

Q: [Defense] He was concerned that his children would be framed for something they didn't do?

A: [Campbell] Yes, sir.

Q: [Defense] He was concerned about his children being responsible for something they weren't responsible for?

A: [Campbell] Yes. Very concerned.

Q: [Defense] All right. So what he was telling you was that his children were not responsible for this murder?

A: [Campbell] More or less, yes. Over and over. He kept on.

Campbell testified:

But the more he talked, the more—I mean, I have been in jail, been in and out [of] a bunch of prisons. The more he would talk about it saying they didn't do it, he is stating—talking things and putting them right back where he said they didn't have nothing to do with it."

The investigators found no evidence of forced entry into the house. A rational factfinder could infer from Campbell's testimony that one of Winfrey, Sr.'s children allowed access to Burr's house. Considering Megan Winfrey's statement that "it was an easy lick," in addition to her other statements and conduct, a rational juror could infer that Winfrey, Sr.'s statements to Campbell implicated Megan Winfrey.

Winfrey, Sr. told Campbell about the theft of the two guns from Burr. The investigating officers did not know about the missing guns before Winfrey, Sr. told Campbell, but the officers were later able to confirm that fact. A rational factfinder could reasonably infer that Winfrey, Sr. knew details about the crime because he was involved or because he learned the details from the actual murderer or murderers. *See Winfrey*, 323 S.W.3d at 881 ("Thus, it is possible that the information

appellant heard could have come from the actual murderer or murderers."). A rational factfinder could reasonably infer that the person that allowed access to the house knew the information about the murder.

The jury found Megan Winfrey guilty of the crimes charged, and the jury's role as "weigher of the evidence" requires this Court to review all of the evidence in the light most favorable to the jury's verdict. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. Even when the facts support "conflicting inferences," a reviewing court must presume the jury resolved the "conflicts in favor of the prosecution," and the court is required to "defer to that resolution." *Id.* at 326, 99 S.Ct. 2781. When all the evidence the jury considered is viewed in the light most favorable to the verdict and the required deference is given to the jury as factfinder, as is required by the applicable appellate standard of review, the evidence is sufficient to support the jury's verdict.

### THE ACQUITTALS

Megan Winfrey's brother, Richard Winfrey, Jr., and her father, Richard Winfrey, Sr., were tried in separate trials. Richard Winfrey, Jr. was acquitted of capital murder and conspiracy to commit capital murder. *Winfrey*, 323 S.W.3d at 876 n. 1. Richard Winfrey, Sr. was convicted of murder. *Id.* at 876. The Court of Criminal Appeals reversed his conviction and rendered an acquittal. *Id.*

█ From the description of the evidence in Winfrey, Sr.'s trial in the opinions of the Eastland Court of Appeals and the Court of Criminal Appeals, it appears considerable additional and different evidence was offered in Megan Winfrey's trial, including inculpatory statements and conduct by the defendant. Nevertheless, in arguing the evidence is insufficient to support her criminal conspiracy conviction, Winfrey asserts for the first time in her supplemental brief in this Court that "since both of the alleged co-conspirators have been acquitted of the capital murder that [Winfrey] is alleged to have conspired to commit with them, the evidence cannot support that [Winfrey] cooperated with one or more individuals to commit capital murder." Essentially, without citation to authority, she asserts the acquittals of her father and brother as a bar to the criminal conspiracy charge on insufficient evidence grounds. A sufficiency review is based on the evidence that was presented to the jury, however, not something that occurred in a separate proceeding.

The jury was charged that to find Megan Winfrey guilty of capital murder it must find that "acting individually or as a party" Winfrey "intentionally caused the death of [Burr] by beating him with her hands and fists and by stabbing him with a knife," while "then and there engaged in the commission of robbery[.]" The jury was charged under the law of parties that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Under the law of parties, it is no defense "that the person for whose conduct the actor is criminally responsible has been acquitted[.]" Tex. Penal Code Ann. § 7.03(2) (West 2003).

The jury was charged on the elements of criminal conspiracy. A person commits the offense of criminal conspiracy if, with intent that a felony be committed, she agrees with one or more persons to engage in conduct that would constitute the offense, and she performs an overt act in pursuance of the agreement. *Id.* § 15.02(a).

Section 15.02(c)(1) of the Texas Penal Code states that the fact that one or more

coconspirators is not criminally responsible for the object offense is not a defense to prosecution for criminal conspiracy. *Id.* § 15.02(c)(1). Section 15.02(c)(2) states that "[i]t is no defense to prosecution for criminal conspiracy that ... one or more of the coconspirators has been acquitted, so long as two or more coconspirators have not been acquitted[.]" *Id.* § 15.02(c)(2). If we assume the last clause of section 15.02(c)(2) is intended to create a defense to prosecution when all alleged coconspirators have been acquitted of criminal conspiracy, we note nevertheless that the Court of Criminal Appeals acquitted Winfrey, Sr. of murder. A conspiracy to commit a crime is a separate and distinct crime from the object offense. *Turner v. State,* 720 S.W.2d 161, 162 (Tex.App.-San Antonio 1986, pet. ref'd). On this record, it does not appear section 15.02(c)(2) is a bar to Megan Winfrey's criminal conspiracy conviction. Generally, "the disposition of the coconspirator's case will not serve as a defense to criminal conspiracy to commit murder." 6 Michael B. Charlton, *Texas Practice: Texas Criminal Law* § 9.3, at 128 (2001) ("... Section 15.02 focuses on an individual's culpability by defining the offense in terms of the individual defendant's conduct rather than that of the group. Thus, a given defendant's case will not be affected by the disposition of coconspirators.").

Appellant's issues are overruled. The judgment is affirmed.

AFFIRMED.

CHARLES KREGER, Justice, dissenting.

"It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Winfrey v. State,* 323 S.W.3d 875, 882 (Tex.Crim.App. 2010) (quoting *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007)). "'[I]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict].'" *Id.* (quoting *Urbano v. State,* 837 S.W.2d 114, 116 (Tex.Crim.App.1992), *superseded in part on other grounds, Herrin v. State,* 125 S.W.3d 436, 443 (Tex.Crim.App.2002)). The Texas Court of Criminal Appeals has cast doubt upon the only evidence that links appellant to the crime scene, the dog scent lineup. The dog scent lineup was the primary evidence offered in support of the charges against appellant by the state in the trial below and is not corroborated. The majority opinion sets aside the dog scent lineup evidence from our sufficiency review and I agree with that portion of the analysis. The remaining evidence is circumstantial and scant and is wholly insufficient for a jury to draw reasonable inferences sufficient to support each element of the criminal offenses beyond a reasonable doubt. I would hold the record evidence is legally insufficient to support the verdict and render an acquittal. The majority affirms the trial court's judgment. Therefore, I respectfully dissent.

## BACKGROUND

Because of the difference in opinion as to the importance of certain factual evidence in the record, I provide my own recitation of the evidence from the record.

In August 2004 Murray Wayne Burr was found murdered in his home. Burr had twenty-five stab wounds, primarily in the head and neck area. He had received multiple sharp and blunt force injuries. In addition to the stab wounds, Burr had extensive craniofacial fracturing, including a broken right eye orbit and broken jaw bone. The evidence indicated that Burr's body had been dragged from the living room to the master bedroom where his

throat was cut. There was no evidence of forced entry into the home. Other than the blood and body, nothing in the home appeared to be out of place. There was no evidence of a long-term struggle. Burr's wallet was on the washing machine, and the only item initially reported missing by his family members was a Bible. Investigators collected a variety of forensic evidence from the scene, including DNA swabs from various items in the house, hair samples, blood stains, a bloody footprint, a footprint cast from the front yard, and a DNA swab from a pair of women's underwear found in the victim's master bedroom. Several items were taken from the home for forensic testing.

## EVIDENCE PRESENTED AT TRIAL

At the time of Burr's murder, Winfrey was sixteen years old. Winfrey lived near Burr and Burr worked as a janitor at the high school Winfrey attended. Winfrey and her brother, Richard Winfrey, Jr., who was seventeen years old at the time of the murder, became persons of interest in the case.

Eleven days after Burr's body was discovered, Texas Ranger Grover Huff interviewed Winfrey. She voluntarily appeared for the interview. According to Huff, Winfrey stated that she had last seen Burr "face-to-face" two weeks prior to his death. During the interview Winfrey stated that she had been to Burr's house on occasion, but denied any inappropriate contact between her and Burr. Winfrey denied any involvement in his death. Huff did not observe any bruises, cuts, or abrasions on Winfrey which may have indicated she had recently been involved in a struggle.

Winfrey voluntarily submitted a buccal swab at the request of investigators. DNA analysis excluded Winfrey as a possible source of the DNA profile obtained from items at the scene. Hair samples obtained from Burr's body yielded a partial female DNA profile. Winfrey submitted a hair sample at the request of investigators and was excluded as a possible source of the unknown female hair. None of the hair, blood, or DNA swabs taken from the scene could be matched to Winfrey or her family members.[1] The majority of the DNA profiles obtained from the scene were from Burr, and the profile that did not relate to Burr was unknown. No physical evidence was recovered linking Winfrey to the murder.

To assist in the investigation, Huff contacted Deputy Keith Pikett, a dog handler with the Fort Bend County Sheriff's office. Deputy Pikett performed scent lineups using scent pads from Winfrey, Richard Winfrey, Jr., and Richard Winfrey, Sr. The lineups were done using bloodhounds that were trained by Pikett and his wife to perform these types of lineups. The jury saw video of the dog scent lineups being performed by Pikett and the dogs.

Pikett performed a dog scent lineup with Winfrey's scent sample in August 2004. Pikett used two bloodhounds, Quincy and Jag, to perform the lineup. The lineup purportedly involved scent samples obtained from the clothes Burr was wearing at the time of the murder and scent samples from six white females, including Winfrey. The dogs were "pre-scented" on the scent obtained from Burr's clothing

1. Winfrey's brother, Richard Winfrey, Jr., and her father, Richard Winfrey, Sr., were tried in separate trials for the offense. Richard Winfrey, Jr. was acquitted of capital murder and conspiracy to commit capital murder. *See Winfrey v. State*, 323 S.W.3d 875, 876–77 n. 1 (Tex.Crim.App.2010). Richard Winfrey, Sr. was convicted of the lesser offense of murder. The Court of Criminal Appeals subsequently reversed his conviction and rendered an acquittal. *Id.* at 876–77.

and then walked by a line of paint cans each containing one of the six female scents. Both dogs alerted[2] to the can containing Winfrey's scent.

Pikett explained that the first time Quincy alerted to the paint can with Winfrey's scent he "didn't like the way [Quincy] did it." Pikett stated that Quincy hit "between two cans" and he believed this happened because "[t]he wind [was] shifting directions." They re-aligned the paint cans and re-did the lineup with Quincy. Quincy alerted to the paint can with Winfrey's scent. Pikett testified that Jag also alerted to the paint can with Winfrey's scent. Pikett also performed a scent lineup with a scent pad obtained from Richard Winfrey, Jr. and five other white males. Pikett testified that both dogs alerted to the scent of Richard Winfrey, Jr. Based on the dog scent lineups, Pikett concluded that Winfrey and Richard Winfrey, Jr. had contact with the clothes Burr was wearing at the time of the murder. However, upon cross-examination, Pikett agreed that a person's scent could be transferred to another person indirectly even when the two persons "have not had direct personal contact."

In August 2007 Pikett was asked to perform a scent lineup using the scent of Winfrey's father, Richard Winfrey, Sr. Three dogs were used in Winfrey, Sr.'s lineup. The jury in Winfrey's trial also saw a video of this lineup. All three dogs alerted to the paint can with Winfrey, Sr.'s scent. Picket testified that based on the August 2007 scent lineup, Winfrey, Sr.'s scent was also on the victim's clothing.

At some point following the initial investigation in 2004, the investigation into the Burr murder reached "a standstill." In July 2006 the San Jacinto County Sheriff's Department received new information about the case from David Campbell, an inmate in the Montgomery County Jail. Campbell testified that in the summer of 2006, he shared a cell in the county jail with Richard Winfrey, Sr. Winfrey, Sr. was out on parole at the time of the Burr murder. Campbell got the impression from talking with Winfrey, Sr. that Winfrey, Sr. may have some knowledge or involvement in the murder. According to Campbell, the only way to know what Winfrey, Sr. purported to know about the Burr murder was to have been there when the murder occurred.

Winfrey, Sr. allegedly stated that his children often visited Burr at Burr's residence and that his children were going to be "framed for something they didn't do." According to Campbell, Winfrey, Sr. stated that one of his children was supposed to have opened a door or a window to allow Winfrey, Sr. to gain access to the house. Winfrey, Sr. did not indicate which child purportedly opened the door or window. Winfrey, Sr. knew that Burr had been "[s]tabbed repeatedly" and also indicated that "[a] couple of antique guns" were taken from the home. Prior to interviewing Campbell, law enforcement investigators were not aware that any guns were missing from Burr's home. Investigators subsequently interviewed Burr's brother-in-law who confirmed that Burr had owned two guns which the family was unable to locate in his house following his death. Campbell also testified that Winfrey, Sr. bragged that Burr's penis had been mutilated; however, this statement regarding the crime was inaccurate. According to Campbell, Winfrey, Sr. was "very concerned" that Winfrey or Richard Winfrey,

---

**2.** An "alert" occurs when the dog matches the scent from the victim's scent pad to the scent pad obtained from the suspect.

Jr. would be held responsible for the murder, and he repeatedly stated that they were not responsible.

Detective Katherine Wick with the San Jacinto County Sheriff's Department testified at trial that in August 2006 she attempted to obtain a pubic hair sample from Winfrey. However, Winfrey had shaved her pubic area "that morning" and Wick·was unable to obtain the sample. According to Wick, Winfrey "made the comment that her brother had called her and stated that [the sheriff's department was] harassing him and that he was mad." Wick advised Winfrey that she would attempt to obtain a sample on September 1 and that shaving her pubic region prior to that time would constitute a violation of the court's order. On September 1, 2006, Wick obtained a pubic hair sample from Winfrey. Winfrey's sample did not match pubic hair recovered from the scene.

At trial, the State presented witness testimony regarding statements allegedly made by Winfrey. Karen Robertson, a teacher from Winfrey's high school, testified regarding a statement made by Winfrey roughly a month before the murder during summer school. Robertson testified that while Burr was working as a janitor, Winfrey saw him in the hall and "jumped up and run and grabbed him by the arm and said, 'Oh, Murray, Murray, when are you going to take me out and spend some of that money that you have? We know you have that money hid at home.'" According to Robertson, Burr looked embarrassed and "went on about his business[.]"

Debra King, another teacher at Winfrey's school in 2003 and 2004, testified she observed Winfrey having a conversation with Burr in the school hallway. King testified that she could not hear the contents of the conversation, but as Burr turned away from Winfrey, she "clinched her fist and said, '[s]omebody should beat the s* * * out of him.'" According to King, Winfrey looked angry and Burr looked distraught, saddened, or "like he really didn't understand." King testified that Winfrey then followed King into her classroom and apologized. Winfrey told King that she "didn't mean to say that aloud," and explained that "she lived near [Burr] and was just tired of all his cats." The record is unclear regarding when the incident occurred.

Jason King,[3] Winfrey's ex-boyfriend, also testified at trial. King dated Winfrey for roughly six months. The relationship began prior to Winfrey's incarceration and continued for several months thereafter. King stated that he contacted the San Jacinto County Sheriff's Department in May 2008 because he was "told some things" by Winfrey that he "needed to get off [his] chest." King testified that Winfrey told him that "they used to take [Burr] to church. They would pick him up and take him to church." King further testified that while he and Winfrey were "partying" together Winfrey stated that Burr was an "easy lick." When the prosecutor asked King whether this meant Winfrey thought "they would get money" from Burr, King testified, "I think so." According to King, Winfrey said nothing else about the Burr murder.

King further testified that he was with Winfrey when she received a phone call informing her that her brother had been arrested for the murder. According to King, Winfrey had King take her to see her ex-husband, Christopher Hammond, stating that she and Hammond needed to discuss their daughter. However, King testified that when they got to Hammond's

---

3. Jason King is of no relation to Debra King.

home the only thing discussed was that Hammond and Winfrey were at a concert the night of the murder. King further testified that Winfrey shaved her pubic region after receiving information that a search warrant was going to be conducted regarding pubic hair.

The evidence established that Winfrey and Hammond had been dating "about five months" at the time of the murder. A dog scent lineup was performed with a scent pad from Christopher Hammond, but the dogs did not alert to Hammond's scent. Hammond and Winfrey were married, had a child together, and were divorced prior to the time of trial. Hammond was not called to testify at trial. However, evidence was presented that Winfrey called Hammond's mother on the morning of the last day of the State's case in chief to inquire about whether Hammond was going to be called to testify.

Winfrey testified at trial on her own behalf. Winfrey stated that she did not murder Burr, did not attempt to rob Burr, did not conspire with her father or brother to murder or rob Burr, did not let her father into the Burr residence, had nothing to do with the Burr murder, and did not know who murdered Burr. Winfrey stated that she and her brother would drive past Burr's residence on their way to church and "would see [Burr] outside in his yard, and we would stop by and see him to see if he wanted to go to church[.]" According to Winfrey, Burr "would always say, '[t]ry next weekend.' " Winfrey testified that she and her brother visited Burr at his residence occasionally and that she was last there "anywhere from two weeks to a month" before his death. According to Winfrey when visiting Burr they "talked about everything," but nothing too significant. Winfrey explained that when visiting Burr she sat on his furniture and had

casual physical contact with Burr, such as a hand shake or hug.

Winfrey stated she was at the Burr residence "probably a handful of times, maybe four or five or six" times during the summer of 2004. Winfrey testified that she also saw Burr when he was working at school. When asked if it was her understanding in the summer of 2004 that Burr had a lot of money, Winfrey stated, "No. He was a janitor." Winfrey testified that she was not aware that Burr owned any guns until she was charged with the offense. Winfrey explained that when she became a suspect in the case she cooperated with authorities by voluntarily submitting a buccal swab, fingerprints, scent evidence, and giving nearly a two-hour statement. Winfrey stated that she had a regular habit of shaving her pubic hair and did not shave her pubic hair to avoid giving a pubic hair sample.

Winfrey did not completely dispute the testimony of Karen Robertson. Winfrey admitted that she made the statement to Burr but "[n]ot those exact words." Winfrey stated that she did not say anything about Burr's money or him having money hidden at his house, and that part of Robertson's testimony was "a little exaggerated." Winfrey did not recall making the statement testified to by Debra King. When asked if she said she thought Burr may have been killed because he was bragging about money to other people, Winfrey stated that Burr said "he was getting a retirement check or something." Winfrey stated, "Yeah, I guess I said that, yeah. If it says I said that, then, yes, I said that." Regarding Ranger Huff's testimony that he questioned Winfrey regarding statements she made about her ability to control men, Winfrey admitted that she had made such a statement explaining that she was "16 and immature."

According to Winfrey, she and King dated for two months before she was incarcerated and four months after she was incarcerated. Winfrey stated that she never said that Burr was "an easy lick," and that she did not know what that term meant but believed it to be drug-related, "like selling drugs or picking up drugs or something to that nature." In response to King's testimony that Winfrey shaved her pubic hair because she learned her brother had been served with a warrant for pubic hair, Winfrey responded that she was not dating King at that time. Winfrey testified that she believed King testified to this because when King asked her why the sheriff's department was accusing her of the crime, and she told King that one of the investigators said the reason he felt she was guilty was because she shaved her pubic hair after obtaining information about the warrant. According to Winfrey, this is how King came into knowledge regarding her shaving of her pubic hair prior to the sheriff department's first attempt to obtain the sample.

Winfrey stated that King's testimony regarding her conversation with Christopher Hammond the day her brother was arrested was "true," but viewed "out of context." According to Winfrey, when investigators questioned her regarding the Burr murder they asked her where she was the night before and she said she was at a concert. Winfrey testified that her conversation with Hammond was, " 'Chris, how can they do this? We were at a concert[,]' " and not an attempt to establish a false alibi. Winfrey further stated that when her brother was arrested she had King take her to Hammond's because she knew she was also being investigated and she wanted to make arrangements for Hammond to watch her daughter in the event that she was also arrested.

On cross-examination, Winfrey stated that her father was paroled nine days before the murder. When asked to explain why her father's scent would be on the clothes Burr was wearing at the time of his murder, Winfrey suggested she could have transferred her father's scent to Burr's residence while visiting Burr. However, after the prosecutor pointed out to Winfrey that she stated that she had not seen Burr during the two weeks preceding his murder and her father had only been out on parole for nine days, she stated that she "never thought of that" and she could not explain why her father's scent was on the clothes Burr was wearing when he was murdered. When asked why her scent might be on Burr's pants leg, Winfrey stated that her scent could have been on his couch and he could have brushed up against it.

The jury convicted Winfrey of capital murder and conspiracy to commit capital murder. Winfrey was sentenced to life as to count one and forty-five years as to count two.

## SUFFICIENCY OF THE EVIDENCE

Richard Winfrey, Sr., was tried for the capital murder of Burr in a separate trial. Winfrey, Sr. was convicted of the lesser offense of murder and sentenced to seventy-five years in prison. *See Winfrey*, 323 S.W.3d at 876–77. The Court of Criminal Appeals found the evidence legally insufficient to support the conviction and rendered an acquittal. *See id.* at 881–82, 884–85. In its opinion, the Court addressed the propriety of relying on scent-discrimination lineups. *Id.* at 882–88. The Court of Criminal Appeals stated:

> [W]e conclude that scent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction. Like the Supreme Court of Washington, we believe that

"[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence." To the extent that lower-court opinions suggest otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive.

*Id.* at 884 (citation omitted).

In reversing the judgment and rendering an acquittal, the Court found significant that "at most" the evidence presented against Winfrey, Sr. showed: (1) Winfrey, Sr. indicated that he believed he was the number one suspect in a murder investigation; (2) Winfrey, Sr. shared information with David Campbell that he claimed to have heard about the murder; and (3) Winfrey, Sr.'s scent was on Burr's clothes. *Id.* at 881–82. The Court found the scent lineup evidence was not "merely supportive" but was essentially the only evidence in the case. The Court stated:

It cannot be denied that the jury and the court of appeals found the dog-scent lineup evidence in this case to be compelling. In 2004, two different dogs alerted only to the scents of appellant's son and daughter. In 2007, three different dogs alerted only to appellant's scent. But, the question essentially presented in this case is whether dog-scent lineup evidence alone can support a conviction beyond a reasonable doubt. And, while this evidence may raise a strong suspicion of appellant's guilt, we nevertheless decide that, standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt.

*Id.* at 884–85.

The State's theory in the present case was that Megan Winfrey and her brother went to Burr's home because they knew they could get in and "sometime during their visit there Megan let [Winfrey, Sr.]

in." The scent lineup evidence was the only evidence presented linking Megan Winfrey, Richard Winfrey, Jr. and Richard Winfrey, Sr. to the murder scene. In determining whether the evidence is sufficient to support the judgment, we must determine whether the scent lineup evidence was the primary evidence in this case or had merely a supportive role. *See Winfrey,* 323 S.W.3d at 883–84.

On appeal, the State argues the dog scent evidence merely corroborates other evidence linking Megan Winfrey to the crime. Specifically, the state argues that the witness testimony regarding statements Winfrey made about Burr is strong evidence that Winfrey committed the offense. The State further contends that evidence of guilt is indicated by Winfrey's "attempt to thwart the recovery of pubic hairs[;]" "meeting with her ex-husband ... to establish an alibi," and "her call to ... Hammond's mother's residence on the last morning of the State's case in chief[.]" Finally, the State asserts that from Campbell's testimony the jury could draw the inference "that Megan Winfrey was the individual that opened the door and allowed [Winfrey, Sr.] access to the house[.]"

### Statements and Conduct of Winfrey

Three witnesses testified regarding statements Winfrey made about Burr. According to Robertson, Winfrey told Burr that she knew he had money hidden at his house. In addition, other witnesses testified that Winfrey stated that Burr "was an easy lick" and that someone should "beat the s* * * out of him." In her own testimony, Winfrey stated that Burr said he was getting a retirement check, and admitted she may have said Burr might have been killed for bragging about money to other people. While these statements may be viewed as inculpatory, none of the statements link Winfrey to the murder,

nor are they tantamount to knowledge or involvement in the murder.

King also testified that on the day Winfrey's brother was arrested, Winfrey had a conversation with Hammond regarding their attendance at a concert that King perceived as an attempt to establish an alibi. Burr was last seen on Thursday, August 6, 2004, at 6:00 p.m. in the afternoon. Burr's body was discovered early on the morning of Saturday, August 8, 2004. Ranger Huff verified that the concert took place the night of August 8, 2004. Therefore, the evidence established that the concert took place after Burr's body was discovered. Winfrey was not questioned regarding the time discrepancy of the concert or her whereabouts on the Thursday or Friday night before Burr's body was discovered. In fact, no witnesses testified regarding the whereabouts of Winfrey or her brother or father on the night before Burr's body was discovered. While Winfrey's statement regarding her and Hammond's attendance at the concert may have been an attempt to establish an alibi, without more, it is not evidence of a false alibi.

Testimony was also presented at trial that Winfrey shaved her pubic hair to avoid giving a pubic hair sample in 2006. Additionally, the State elicited testimony from Winfrey regarding her phone call to Hammond's mother on the morning of the last day of the State's case in chief to determine whether Hammond would be testifying against her.[4] Winfrey's conduct is inculpatory and may give rise to an inference that she had some knowledge about the murder. However, without more, a jury could not reasonably infer from this testimony that Winfrey committed the murder or conspired to commit the murder.

### Cellmate Testimony

The State asserts that Campbell "testified that Winfrey Sr. indicated the kids had let him in the Burr residence[.]" A review of the record though, does not support such an assertive contention. At trial Campbell testified as follows:

Q: [State] And did [Winfrey, Sr.] ever indicate that he had been present or knew what may have happened in that murder or did you get that impression?

A: [Campbell] I got that impression after him talking over and over. The things that he was saying that the only way he would be able to know exactly what he was saying would have been to put him at the murder. . . .

. . . .

Q: [State] Did Richard Winfrey Sr. indicate that the kids had something to do with him getting into the house?

. . . .

A: [Campbell] Yes.

Q: [State] And what did he convey to you?

A: [Campbell] That his children—that [Burr] was a janitor at their school; that they frequently would go over there and visit with Richard; and one of them they used—one of them, when he got out of wherever he was at, they went to this house and was supposed to have opened a door or window. I don't know if it was

---

4. When asked why she called Hammond's mother, Winfrey testified that she "called and asked why [Hammond] was subpoenaed, [and] if he was going to testify." Winfrey stated that she assumed Hammond was "another character witness." When asked if she was afraid he had something incriminating about her to say, Winfrey stated, "[w]ell, we are divorced. I'm not afraid, but we are divorced. So, obviously, there was some, you know, differences there between us. So what can somebody's ex-husband have just so pleasant to say about his ex-wife?"

a door or the window in the back of his house.

Q: [State] For him to gain access?

A: [Campbell] Right.

Q: [State] And then, subsequently, the murder occurred?

A: [Campbell] Yes.

Q: [State] Did he indicate how Mr. Burr may have been murdered, the manner?

A: [Campbell] Yes. Stabbed repeatedly.

. . . .

Q: [State] Did he indicate any particular concerns regarding his son, Richard, Jr.?

A: [Campbell] That was his biggest concern the whole time I was there. . . . It was the well-being of his children, Megan and Richard, both, that they was going to be framed for something they didn't do.

Q: [State] Did [Winfrey, Sr.], have concerns about Richard, Jr., breaking?

A: [Campbell] He would be the first to speak, yes.

Q: [State] So there was an indication from [Winfrey, Sr.] that it was the kids that allowed access to be gained to the house, is that correct?

A: [Campbell] Not kids. He just said one of them.

Q: [State] One of them?

A: [Campbell] He didn't say which one.

Q: [State] But did he indicate both were there, and it was one of them that let him in?

A: [Campbell] That let him in? He didn't say exactly let him in. He just said—

Q: [State] Allowed him to gain access?

A: [Campbell] Access. I mean, that's hearsay. I mean—

Q: [State] Yeah. Okay. Now, you appear nervous.

A: [Campbell] Well, I am. I mean, I don't—I don't know Megan. I have never met her. I mean, everything that you are asking me is hearsay to this trial. You know, I—

Campbell testified as follows on cross-examination:

Q: [Defense] All right. And I think you said earlier he was concerned about his children would be framed. I think that was your exact words?

A: [Campbell] Exact words.

Q: [Defense] He was concerned that his children would be framed for something they didn't do?

A: [Campbell] Yes, sir.

Q: [Defense] He was concerned about his children being responsible for something they weren't responsible for?

A: [Campbell] Yes. Very concerned.

Q: [Defense] All right. So what he was telling you was that his children were not responsible for this murder?

A: [Campbell] More or less, yes. Over and over. He kept on.

Even when viewed in the light most favorable to the verdict, the record shows that Campbell did not testify that Winfrey, Sr. indicated to Campbell that he was present or had knowledge regarding what happened in the murder. Campbell testified that he "got that impression" after talking with Winfrey, Sr. about the murder. Likewise, Campbell did not testify that Winfrey, Sr. stated that his children were involved in the murder. Rather, Campbell testified that Winfrey indicated that one of the kids *was supposed to have* opened a door or a window to allow Winfrey, Sr. to gain access to the residence. When the State tried to elicit testimony from Campbell that Winfrey, Sr. indicated that this had actually happened, Campbell

stated, "I mean, that's hearsay. . . . [E]verything that you are asking me is hearsay[.]"

Campbell testified that Winfrey, Sr.'s primary concern was that his children were going to be "framed for something they didn't do." During cross-examination Campbell reiterated that Winfrey, Sr. was concerned about "his children being responsible for something they weren't responsible for." The State's assertion that Campbell "testified that Winfrey[,] Sr. indicated the kids let him in" the Burr residence is an inaccurate characterization of Campbell's testimony. Reading Campbell's testimony in its entirety, it is clear that Campbell thought Winfrey, Sr. was involved by the way he talked about the crime and not because Winfrey, Sr. made any direct admissions of involvement by him or his children. Notably, Campbell also testified to facts reiterated by Winfrey, Sr. regarding the murder that turned out to be inaccurate.

### Scent Lineup Evidence

The scent lineup evidence presented by the State was significant. Specifically, the State presented evidence that two different dogs alerted to the scent of Megan Winfrey and Richard Winfrey, Jr. and that three different dogs alerted to the scent of Richard Winfrey, Sr. According to Pikett's testimony, based on the lineups, the scent of Megan Winfrey, Richard Winfrey, Jr. and Richard Winfrey, Sr. was on the clothes Burr was wearing at the time of the murder. In addition to presenting scent lineup evidence in order to place Winfrey and her brother and father at the murder scene, the State presented evidence to undermine the theory that Winfrey could have transferred her father's scent to the scene. Specifically, Pikett testified that it was more likely that Megan would have indirectly transferred the scent of her boyfriend, Hammond, to the Burr residence than the scent of her father. The dogs did not alert to Hammond's scent. Additionally, Winfrey's acknowledgment that her father was released on parole only nine days prior to the murder and that she had no explanation as to how his scent could have gotten on Burr's clothes was very damaging testimony. No other direct evidence put Richard Winfrey, Sr. at the murder scene.

### CONCLUSION

Winfrey was charged with capital murder and conspiracy to commit capital murder. A person commits the offense of murder if she intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). The jury was charged that to find Winfrey guilty of capital murder it must find that "acting individually or as a party" Winfrey "intentionally caused the death of [Burr] by beating him with her hands and fists and by stabbing him with a knife," while "then and there in the course of committing or attempting to commit the offense of robbery[.]" The jury was charged under the law of parties that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." [5] The jury was also charged on the elements of conspiracy. A person commits the offense of conspiracy if, with intent that a felony be committed, she agrees with one or more persons to engage in conduct that would constitute the offense, and she performs an overt act in pursuance of the

---

5. Under the law of parties, it is no defense "that the person for whose conduct the actor is criminally responsible has been acquit-

ted[.]" Tex. Penal Code Ann. § 7.03(2) (West 2003).

agreement. Tex. Penal Code Ann. § 15.02(a) (West 2003). The indictments named Richard Winfrey, Jr. and Richard Winfrey, Sr. as the alleged co-conspirators and that was the theory by which the State prosecuted Megan Winfrey.

The scent lineup evidence was the only direct evidence presented at Winfrey's trial linking Winfrey or her family members to the scene of the Burr murder. No eye witnesses put Winfrey or her family members at the crime scene. No witnesses testified regarding Winfrey's whereabouts on the night of the murder. Winfrey voluntarily submitted a buccal swab, hair, and fingerprints. Winfrey did not match the DNA profile obtained from the crime scene. Winfrey's hair samples could not be matched to hair recovered from the scene. Further, no DNA, hair, or fingerprints put Winfrey's brother or father at the scene. There was no testimony that the bloody footprint found at the scene was matched to Winfrey or any of her family members. None of Burr's belongings were ever found in Winfrey's possession and nothing belonging to Winfrey was linked to the scene. Further, there was no evidence that Winfrey or any of her family members were ever seen with the missing Bible, guns, or any other possessions that could be linked to Burr.

The scent lineup evidence against Megan Winfrey, Richard Winfrey, Jr. and Richard Winfrey, Sr. was not merely supportive but was the primary evidence presented against appellant in this case. Simply put, none of the other direct evidence linked appellant to the murder or otherwise corroborated the positive findings of the scent line up. Accepting the jury's credibility determinations and taking all the other witness testimony presented against appellant as true, the evidence raises only a suspicion of guilt. Moreover, there was no evidence, other than the scent lineup evidence, from which an agreement between Winfrey and her brother or father to commit the crime could be inferred.

Based on our review of this record in light of the recent holding by the Texas Court of Criminal Appeals, I would find the evidence, even when viewed in the light most favorable to the verdict, merely raises a suspicion of guilt and is legally insufficient to support the convictions for capital murder and conspiracy to commit capital murder beyond a reasonable doubt. I would reverse the judgment, and render a judgment of acquittal. *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (holding if the record evidence is legally insufficient under the *Jackson* rule, the reviewing court must render a judgment of acquittal).