Samuel BUSTAMANTE, Appellant,

v.

The STATE of Texas.

No. 74079.

Court of Criminal Appeals of Texas.

June 4, 2003.

J. Sidney Crowley, Houston, for Appellant.

David C. Newell, Asst. DA, Fort Bend, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined.

Appellant was convicted of capital murder and sentenced to death.[1] On direct

appeal to this Court he raises four points of error.[2] We shall affirm.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Background

Viewed in the light most favorable to the verdict, the evidence at trial shows the following: On January 17, 1998, Walter Escamilla, Arthur Escamilla, Dedrick Depriest, and appellant planned a robbery. Walter suggested that the four of them go to the town of Rosenberg to go "shopping." According to appellant,[3] "shopping" entailed finding a "wetback"[4] after the bars closed, offering him a ride, taking him to a deserted location, beating him, and stealing his money and jewelry. Appellant told Solomon Escamilla[5] and Brandy Riha[6] that he was going shopping in Rosenberg with Walter, Arthur, and Dedrick.[7] The four men, traveling in Arthur's pickup truck, arrived in Rosenberg at about 2:00 a.m., just after the bars had closed. At first the group had trouble finding a victim. But just as they were about to give up, they came upon Rafael Alvarado, a hispanic male. Appellant noted that Alvarado's clothes were in good condition and his watch looked like it was made of "real gold."

Alvarado offered to pay the driver of the truck to give him a ride across town. The men agreed, and Alvarado climbed into the bed of the pickup. Arthur and Depriest sat in the truck cab while appellant, Walter, and the victim sat in the truck bed. After about fifteen minutes, appellant asked Walter what he was going to do. Walter told appellant to wait but appellant stood up and began stabbing Alvarado with a knife. Appellant stabbed him ten times. When Alvarado tried to escape, Walter caught him by the shirt and made an effort to pull him back in. Appellant also tried to pull Alvarado in, but the victim managed to break free and fall to the ground. Walter yelled at the driver of the truck to stop, but by the time he did, appellant and the others were unable to see Alvarado because of the darkness.[8] Appellant told Depriest that he wanted the victim's boots. After the men walked around the area for several minutes[9] without finding the victim, appellant decided that they should leave. Depriest admitted that, had they found the victim, they probably would have robbed him. As the truck

---

1. TEX. PEN. CODE § 19.03(a); Art. 37.071 § 2(g). Unless otherwise indicated all references to Articles refer to the Texas Code of Criminal Procedure.

2. Art. 37.071 § 2(h).

3. Appellant made two confessions—an electronically-recorded oral confession and a written confession—in which he related the events of the crime.

4. A "wetback" appears to refer to an illegal alien of Hispanic origin.

5. Solomon was Walter and Arthur's brother. They had another brother named Richard. Solomon was also appellant's brother-in-law (married to appellant's sister).

6. Riha was the ex-girlfriend of appellant's brother, Bill Bustamante.

7. Solomon was apparently aware of the criminal usage of the word "shopping" while Riha was not. Solomon testified that one meaning of shopping was to "roll wetbacks," that is, to beat and rob them. Riha testified that she thought it was strange that appellant and the other men would go shopping so late at night.

8. Apparently the victim was still able to walk and eluded his captors.

9. According to appellant, they looked for the victim for less than fifteen minutes.

drove away, the others in the group remarked that appellant was crazy.

The police followed a trail of blood from the west city limits of Rosenberg to where Alvarado's body was found, in a ditch in Fort Bend county. He was wearing a watch, a gold necklace, and a ring. He also had a hundred dollars in his pockets and his wallet was undisturbed. His death was caused by stab wounds to the heart and liver and the attendant loss of blood.

After returning from Rosenberg, appellant told Solomon and Richard Escamilla to wash the truck before daylight. There was blood in the bed of the truck and a hand-print on the tailgate. Appellant told Solomon that things went wrong and that someone had gotten in the way of what appellant does. Appellant explained that he had gotten hold of a man the night before and the man had fallen out of the truck. When Solomon showed appellant a story about the victim in the paper, appellant responded, "That's what I told you, nobody gets away," saying that when he kills somebody, he knows he kills them. Solomon and Richard joked with appellant by telling him not to stab them and by trying to give him their money.

Viewing the record in a neutral light reveals the following evidence favorable to appellant. Depriest claimed that the group had not formulated a robbery plot but traveled to Rosenberg to "have fun and party." He further stated that he assumed the group was going to drop Alvarado off at his desired destination.

### B. Analysis

■ In points of error one and two, appellant contends that the evidence is legally and factually insufficient to show that he committed the underlying offense of robbery or attempted robbery. In his brief, he concedes that his confessions "indicate that the group had originally planned to go to Rosenberg to rob illegal aliens," but he argues that the murder was not connected to that plan. In support of his argument that the murder was not connected to the prior plan to rob someone, appellant points out that no money or property was taken from the deceased and that no one in the group had demanded money from the deceased. Appellant also points to testimony of Depriest that they did not intend to rob anyone but went to Rosenberg to party and that the group actually intended to fulfill the agreement to give Alvarado a ride home for money. Finally, appellant contends that the murder "shocked the other participants, who seemed to have been taken aback by appellant's actions."

Evidence is legally insufficient if, viewed in the light most favorable to the prosecution, no rational jury could find the defendant guilty beyond a reasonable doubt.[10] Evidence is factually insufficient if, viewed without the prism of "the light most favorable to the verdict," the evidence supporting the verdict is so weak or so against the overwhelming weight of contrary evidence as to render the verdict clearly wrong and manifestly unjust.[11]

We find appellant's claims to be without merit. While no completed theft occurred, proof of a completed theft is not required to establish the underlying offense of robbery or attempted robbery.[12] Moreover, an intent to steal may be inferred from

---

**10.** *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**11.** *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim.App.2000).

**12.** *Maldonado v. State,* 998 S.W.2d 239, 243 (Tex.Crim.App.1999).

circumstantial evidence.[13] Here, there was direct evidence from appellant's own confessions that the group intended to rob someone in Rosenberg, and further, that the group intended to rob the victim. Appellant told two other people that he intended to go shopping (despite the late hour), which appellant acknowledged was code for robbing someone. The fact that appellant noticed the victim's watch was made of real gold indicates that robbery was still on his mind. The intent to rob is not necessarily negated by the fact that he attacked the victim earlier than the rest of the group anticipated—a rational jury could have believed that appellant intended to start the robbery early. Furthermore, his desire to retrieve the victim's boots is evidence that appellant did indeed intend to steal from the victim at the time he committed the murder. Finally, appellant's failure to contradict Solomon's and Richard's jokes about stealing money could be interpreted as tacit acceptance of the idea that the murder was part of an attempted robbery. The jury could have rationally found appellant guilty of the underlying offense.

Likewise, we find the evidence to be factually sufficient. Even looking at the evidence in a neutral light and considering Depriest's exculpatory statements, the evidence is sufficient to show a robbery or attempted robbery. The jury was well within its discretion to believe Depriest's and appellant's prior incriminating statements and to disbelieve the self-serving statements made by Depriest on the witness stand. Moreover, even if the jury fully believed Depriest's statements, the evidence would nevertheless support a conclusion that appellant intended to rob the victim at the time of the murder, even if the others did not. The evidence supporting appellant's guilt is not so weak or so against the overwhelming weight of the contrary evidence so as to render the jury's verdict clearly wrong and manifestly unjust. Points of error one and two are overruled.

## II. JURY DELIBERATIONS

### A. Background

During the course of their investigation, police officers interviewed appellant's brother, Bill Bustamante, and procured from him a signed, written statement. During the guilt/innocence phase of trial, the State called Bill to testify, but he declined. Upon the State's request, the trial court granted Bill immunity for any testimony given at the trial and ordered him to testify. Bill Bustamante persisted in his refusal to testify and the trial court held him in contempt. His written statement, which had been marked State's Exhibit 107, was never admitted into evidence. Another item, a chart or graph, was later marked as Exhibit 107 and admitted into evidence.

Both items marked "Exhibit 107" were included with the exhibits in the jury room. During jury deliberations on guilt, one of the jurors read the Bill Bustamante statement aloud while others listened with varying degrees of attentiveness. After the statement was read, the jurors became concerned about whether it was properly before them. As a result, the jury foreman sent a note to the trial judge asking, "Judge, can we use exhibit 107 in making our decision?" The trial judge subsequently discovered that Bill Bustamante's written statement was in the jury room and had it removed.

From questioning the foreman, the trial judge ascertained that the jurors were indeed inquiring about the Bill Bustamante

**13.** *Wolfe v. State,* 917 S.W.2d 270, 275 (Tex. Crim.App.1996).

statement. The trial judge proceeded to question each juror individually about the statement, how much of it they had read or heard, whether it presented anything new, whether it had influenced them, and whether they could follow an instruction to disregard the exhibit. Nine jurors said that they had not read the statement but had heard some or all of it being read. Three jurors said they had read the statement or parts of it, aloud or to themselves. Of the twelve jurors, five said that they learned nothing new from the statement, three said that they learned that appellant had "gone shopping" before, and four said they learned about an incident at a truck stop, after the murder, in which appellant apparently started to break into another vehicle occupied by a sleeping person. One juror said she also learned that appellant had told his brother before leaving for Rosenberg that he intended to rob someone. Before being asked whether they could follow an instruction to disregard, eight jurors said that the evidence would not influence their decision. The other four were not asked that question. One juror told the court that a round of voting had already occurred before the statement was read, and three jurors volunteered they had already made up their minds before the statement was read. Several said that they were not paying much attention to the statement when it was read. Finally, all twelve jurors said that they could completely disregard the exhibit if instructed to do so.

After questioning all the jurors, the trial court brought them into the courtroom as a group and issued an instruction to disregard the Bill Bustamante statement:

> Members of the jury, now that I've had an opportunity to talk to each one of you 12 jurors individually, I need to give you an additional admonition; and that admonition is as follows: Because of the factors that we discussed here individually a few minutes ago, specifically that there were two State's exhibit number 107 marked in this case. Only the first State's exhibit 107 was actually admitted by me into evidence. That State's exhibit number 107 is this plat which is down here on the floor. That may be considered by you, and I'm answering your question now. That exhibit number 107 may be used in making your decision in this case. The second State's exhibit number 107 was mismarked. That purports to be a statement by Mr. Bill Bustamante. That State's exhibit number 107 was never put into evidence, and you are not to consider it as evidence of any kind for any purpose at any stage of this trial. You are to make a decision in this case based only on the law and the evidence, specifically the evidence which has been admitted before you for your consideration, which would be the physical pieces of evidence that are admitted and the testimony that you've heard from the witness stand in here. In short, you're not to use anything that you may have read or heard from the purported Bill Bustamonte statement for any purpose whatsoever. That's an additional admonition that you are charged to follow.

After the jury was sent back to the jury room to deliberate, appellant moved for a mistrial on the basis that the jury had received other evidence during deliberations. After hearing arguments on the matter, the trial court denied the motion. The jury later came back with a guilty verdict for the offense of capital murder. Appellant also complained about this matter in a motion for new trial, which was denied.

### B. Analysis

■ In points of error three and four, appellant contends that the trial court

should have granted a mistrial or a new trial because the jury's examination of the Bill Bustamante statement constituted the receipt of evidence that was not admitted at trial. The pertinent rule regarding a new trial is Texas Rule of Appellate Procedure 21.3(f), which requires, in relevant part, that a new trial be granted "when, after retiring to deliberate, the jury has received other evidence." Before the rules of appellate procedure were adopted, this rule was codified, in virtually identical language, at Texas Code of Criminal Procedure 40.03(7).[14] We shall construe Rule 21.3(f) in the same manner as we construed its predecessor statute.[15]

■ Under caselaw from this Court construing the predecessor statute, a two-prong test must be satisfied for the defendant to obtain a new trial: (1) the evidence must have been received by the jury, and (2) the evidence must be detrimental or adverse to the defendant.[16] In determining whether evidence was "received" by the jury, a court may consider how extensively the evidence was examined by the jury and whether the jury was given an instruction to disregard.[17] In *Eckert v. State*, we observed that an instruction to disregard at the deliberations stage is "similar to the corrective action of an in-

struction to disregard evidence improperly introduced at trial."[18] If the trial court gives an instruction to disregard and that instruction is found to be effective, then under our law, it is as though the evidence was never "received" by the jury.[19]

Caselaw is not clear on whether the same standards apply to mistrials—where the issue is manifested before the jury has reached a verdict. Several cases involving unauthorized communications, covered in the same new trial rule as the receipt of other evidence, have not distinguished between new trial and mistrial situations.[20] In *Brown v. State*, the receipt of other evidence and a mistrial were at issue, but we did not address whether raising the issue before or after trial made a difference.[21] Instead, we simply observed that we were confronting a different case because the events at issue occurred before deliberations had begun.[22] Nevertheless, we analogized to other situations, including the new trial rule, and determined that a mistrial was not required if an instruction to disregard would have cured the error.[23] This holding is in line with *Eckert*, a new trial case, holding that an instruction to disregard during deliberations was comparable in effect to an instruction to disre-

---

14. The statute required that a new trial be granted "[w]here the jury, after having retired to deliberate upon a case, has received other evidence."

15. *See, e.g., Salazar v. State,* 38 S.W.3d 141 (Tex.Crim.App.2001)(caselaw construing Article 40.03 valid in construing Tex.R.App. P. 23.1).

16. *Eckert v. State,* 623 S.W.2d 359, 364 (Tex. Crim.App.1981), *overruled on other grounds, Reed v. State,* 744 S.W.2d 112 (Tex.Crim.App. 1988); *Stephenson v. State,* 571 S.W.2d 174, 176 (Tex.Crim.App.1978).

17. *Eckert,* 623 S.W.2d at 364; *Stephenson,* 571 S.W.2d at 176.

18. *Eckert,* 623 S.W.2d at 364.

19. *Id.*

20. *Moody v. State,* 827 S.W.2d 875, 899–900 (Tex.Crim.App.1992); *Robinson v. State,* 851 S.W.2d 216, 230 (Tex.Crim.App.1991); *Williams v. State,* 463 S.W.2d 436, 440 (Tex. Crim.App.1971).

21. 516 S.W.2d 145, 146 (Tex.Crim.App.1974).

22. *Id.*

23. *Id.*

gard inadmissible evidence.[24] At least with respect to whether an instruction to disregard can cure the error, then, the standards are the same.

In this case, the jurors recognized that there was a potential problem with the Bill Bustamante statement and queried the trial judge for instructions. The trial judge then carefully examined all of the jurors regarding the matter. In response to the trial judge's questioning, all the jurors stated that they could follow an instruction to disregard the statement. The trial judge subsequently issued an instruction to disregard. Under the circumstances presented here, we find that the Bill Bustamante statement was not "received" by the jury and any error associated with that statement was cured by instruction. Points of error three and four are overruled.

The trial court's judgment is affirmed.

JOHNSON, J. dissented.

**24.** *See* above discussion.