

# NUMBER 13-20-00070-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**JOSEPH ALVARADO,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

### On appeal from the 290th District Court
### of Bexar County, Texas.

## MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Silva
### Memorandum Opinion by Justice Silva

Appellant Joseph Alvarado appeals his conviction of the lesser-included offense

of felony murder.[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(3). By three issues, appellant

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

argues (1) the evidence was legally insufficient to support his conviction; (2) the trial court abused its discretion in denying his motion for mistrial; and (3) his trial attorney provided ineffective assistance of counsel.[2] We affirm.

## I. BACKGROUND

Tarik Ross died as a result of multiple gunshot wounds on March 7, 2018, according to William McClain, the medical examiner for Bexar County.[3] On March 15, appellant was arrested for capital murder in connection with Ross's death. Five others were also implicated: M.H.,[4] James Berg, Drevonte "Dre" King, Raeshaun Woodard, and Jayshawn Johnson.[5]

### A. The State's Case-in-Chief

### 1. Erickell Willrich

At trial, Ross's girlfriend of seven years, Erickell Willrich, testified that Ross received a phone call around 2 p.m. on March 6, 2018, from an individual she had never met named "Dre." Willrich testified she had been looking to sell her car, and "Dre told [Ross] that he had a potential car buyer." Ross and Willrich drove to the address provided by Dre after picking up their two-year-old son from daycare around 4 p.m.

---

[2] The State has not filed a brief in this appeal.

[3] McClain testified that two different sized projectiles were recovered from Ross's body. McClain opined that the projectile that came to rest inside Ross's cranial cavity appeared to be of a smaller caliber, based on the diameter of the projectile base, than the projectile recovered from Ross's right forearm.

[4] M.H. is a juvenile. See TEX. R. APP. P. 9.8 cmt.

[5] At some unspecified point during the pendency of Ross's murder investigation, Johnson was murdered. No other specifics were provided at trial.

At the location, Willrich noticed a juvenile, later identified as M.H.,[6] standing outside of a white Cadillac with tinted windows. M.H. entered Willrich's vehicle through the back passenger side uninvited and immediately started "digging through [her] son's diaper bag." When Willrich confronted him, M.H. responded, "My bad," and moved his hand into his jacket, retrieving a gun. According to Willrich, the following transpired:

> [M.H.] then he points the gun at my son's face and then points it towards me and then puts it to the back of [Ross's] head and shoved it. And then [M.H.] jumps out of the car and then runs to like the [driver's side] door and he couldn't open it. . . . [A]nd then backs up and points his gun at the window like he was getting ready to open fire. . . . [Ross] like looked at me and reversed—like shifted gears and started reversing the car. And right when the car started moving, that's when like bullets started coming in.

Willrich said she did not initially realize Ross had been shot. Their vehicle collided into a fence, and Willrich leaned over to put it in park. Neighborhood witnesses called 9-1-1.[7] Although Willrich testified that she "saw somebody else get out" of the Cadillac when the shooting started, she was unable to provide a description.[8] At some point between the car reversing and coming to a stop, Willrich threw out Ross's backpack and other belongings. Willrich saw M.H. grab Ross's backpack before jumping into the passenger side of the Cadillac and driving off. Willrich denied knowing the contents of the backpack and stated that while she was "aware" Ross sold marijuana, she denied that they had been meeting anyone to sell drugs.

---

[6] In a police lineup, Willrich identified M.H. as the shooter.

[7] Ricky and Norma DeLomba testified they had just returned to their residence and were still in their vehicle when they heard shots fired and turned to see a white Cadillac across the street. Both witnesses testified that they saw two shooters but could only provide a description of the shooter that had been "in the middle of the street," who they each witnessed grab a backpack off the street before returning to the Cadillac and leaving. The shooter they identified matched a description of M.H.

[8] In a body camera recording from a responding officer admitted at trial, Willrich can be heard stating she saw "somebody else get out with like a white t-shirt." Willrich also described the driver of the white Cadillac as a black male but stated she "wasn't sure."

## 2. Law Enforcement

Officers with the San Antonio Police Department (SAPD) and ambulatory services arrived at approximately 4:26 p.m. Ross was transported to a nearby hospital, where he succumbed to his injuries the following day. Scott Coonradt, a crime scene investigator with SAPD, testified he located four 9-millimeter caliber Luger spent shell casings and one .40 caliber Smith and Wesson spent shell casing near Ross's vehicle. Coonradt opined that the shell casings looked "pretty fresh" and did not appear to have "any type of weathering." SAPD Detective Lawrence Saiz testified similarly, stating that the different casing sizes indicated two weapons had been involved.

After learning that Ross was at the location following the direction of a man named "Dre," Detective Saiz seized Ross's phone. A search of Ross's phone revealed contact information for "Dre," who was later identified as King. Detective Saiz stated the text messages exchanged between King and Ross indicated the two were meeting on March 6th to execute a drug transaction.

On March 14, 2018, King and Berg, the actual owner of the phone used by King, were brought in for questioning. Detective Saiz questioned Berg while another detective questioned King. Detective Saiz stated that the two men were interviewed separately but simultaneously to better assess their credibility and corroboration or lack-thereof. Although Berg attempted to "distanc[e] himself from the actual crime" for the first twenty minutes of the interview, Detective Saiz said Berg eventually provided law enforcement with information on the co-defendants, including the location of the white Cadillac. Berg was unable to identify M.H. or appellant by name but gave physical descriptions of the two men.

4

Using information provided by Berg during his interview, Detective Saiz executed a search warrant of Woodard's residence and secured a white two-door Cadillac parked at the residence.[9] Officers also located a backpack and several items of clothing with blood stains, including a jacket, inside a BBQ grill on the back porch. Neither M.H. nor Ross could be excluded as sources of DNA tested from the jacket and backpack. Woodard was subsequently placed under arrest and interviewed by Detective Saiz. Woodard implicated appellant in the shooting.

Detective Saiz testified that prior to interviewing Berg, King, and Woodard, SAPD received two anonymous Crime Stoppers tips naming appellant as a suspect in the shooting. The first informant stated:

Joseph [A]lv[a]rado a 23 or 24 y[ea]r old man black and [H]ispanic. He shot a man on sw street and the man later died at university hospital[.] [H]e shot up a car with a woman and child in [the] back seat. . . . I know this from Facebook and those people from crocket [sic] the trap house and that's where [appellant] stays at.

The informant requested that his or her identity be kept confidential because he or she feared "harass[ment]" "or even worse." The informant also disclosed that appellant sold drugs and had been physically abusive towards his girlfriend, Sarah Strickland. Several hours later, another tip was submitted: "Joseph [A]lv[a]rado shot at a 21 y[ea]r old [T]arik [R]oss on 5300 [S]herry [D]rive[.] [I]t happened at 4:30 pm a few days ago[.] I saw it on [F]acebook." This tip also included a phone number and Facebook page information for appellant and appellant's girlfriend.

Though law enforcement never located appellant's phone to conduct a data extraction, Detective Saiz testified that he was able to obtain and review appellant's cell

---

[9] Although Ross's vehicle and the Cadillac were both "processed" for fingerprints, there were no returned matches for any of the co-defendants in this case.

phone records from his phone provider. The records indicated appellant was in frequent communication with Johnson immediately before and after the shooting.[10] Appellant's phone was also in the same "coverage area" as the crime scene during the time of the murder.

### 3. Co-Defendants Berg and King

At trial, Berg testified that he and King had sustained non-life-threatening gunshot wounds during an unrelated shooting a few days after Ross's murder. Berg believed he was going to be speaking to law enforcement as a complainant, not suspect, when he agreed to meet with police.

Berg testified that in March 2018 he had been living with King in a small "barn" behind a trailer. Berg had lent his phone to King to contact Ross on March 5th and March 6th, the day of the shooting. According to Berg, Ross was a "plug," "someone who you can get drugs from on a regular basis." Berg believed the contact was for the purchase of marijuana, and he only learned "afterwards" about the plan to rob Ross. Berg said M.H., Berg, Woodard, Johnson, and appellant were "all in on the plan" and present at the barn when the discussion took place on March 5. The plan was to lure Ross to a random location a few streets away from the barn and rob him.

Berg testified that on March 6, all six men gathered at the barn before the robbery. Woodard drove the white two-door Cadillac, Johnson sat in the front passenger seat, and M.H. and appellant sat in the back. Berg stayed behind at the barn with King. Approximately ten to fifteen minutes later, Berg heard "five or six" gun shots. While Berg

---

[10] There were calls placed from appellant to Johnson at 4:00 p.m. (12 seconds), 4:08 p.m. (9 seconds), 4:17 p.m. (62 seconds); 4:19 p.m. (27 seconds), 4:22 p.m. (17 seconds), 4:25 p.m. (35 seconds), and 4:26 p.m. (3 minutes). For the next hour, there were "seven calls back and forth," testified Mark Sedwick, special agent with the Federal Bureau of Investigations.

6

never saw Woodard or M.H. again, Berg said Johnson returned to the barn later and threatened him to "keep [his] mouth shut or else."

Berg testified that after he was arrested, he was placed in a booking cell along with fifteen to twenty other individuals, including appellant.[11] Appellant purportedly told Berg that he had exited the Cadillac after M.H. Berg testified that appellant said:

Hey, I just want you to know that all I really did was—I messed up. I was at the window, and [Ross] ended up throwing the car in reverse. And everybody got scared, and [M.H.] shot. And then I tripped[,] and I fell and I shot the bottom of the car.

Woodard also testified at trial.[12] He stated Johnson had contacted him concerning "a play," "some way to get money." Woodard knew Johnson from a prior "play"; the two were convicted for burglary of a habitation in 2017. Woodard said he met with Johnson, M.H., Berg, King, and appellant at the barn. Woodard identified everyone's role in the robbery: Johnson supplied the weapons; King communicated with Ross, using Berg's phone, to draw Ross to the location; M.H. was "the one to actually rob [Ross]"; appellant was "backup"; and Woodard drove.

Woodard testified that on the day of the shooting, appellant and M.H. carried guns, a "Glock 27" and a "Glock 19," respectively. Woodard drove M.H. and appellant to the location. After Ross arrived, Woodard watched M.H. enter Ross's vehicle on the back passenger side. "About five minutes after that," Woodard saw Ross try to "pull off," and that is when appellant exited the Cadillac. Woodard said appellant was situated "to the

---

[11] Lieutenant Charles Cagle with the Bexar County Sherriff's Office testified Berg was booked on March 16 at 11:02 a.m., and appellant had been booked earlier that morning at 8:18 a.m. Although Cagle was unable to confirm whether the two shared a cell, Cagle testified that there were only two cells used to house all inmates during the booking process and the booking process takes "[a]nywhere from 8 to 12 hours."

[12] In exchange for Woodard's testimony, the State entered into a plea bargain agreement with Woodard for a twenty-year sentence for the lesser included offense of murder.

front" of Ross's vehicle, while M.H. was "at the back of the car." After M.H. and appellant shot at Ross's vehicle, Woodard witnessed a bag get thrown out of the vehicle while it was rolling in reverse. He said the bag was picked up by M.H. Appellant and M.H. returned to the Cadillac, and Woodard then drove them to his residence, where Johnson was waiting.

### 4. Jailhouse Informant

Jailen Collins testified concerning his connection to several of the parties involved in this cause.[13] Collins, however, first met appellant while the two were incarcerated at the county jail. Collins testified that during their discussions, appellant admitted to him that they had "set [Ross] up." "[Appellant] said that he got out the car because it was, I guess, taking a minute and he pulled—he tapped on the window with the gun and told [Ross] to give up the stuff," testified Collins. After Ross "tried to pull off," appellant said he and M.H. started shooting. Collins testified that appellant told him Ross was shot in the head.

---

[13] Collins stated he reached out to King "asking him to help . . . find some weed" in Spring 2018. In the early morning hours of March 6, 2018, King introduced Collins to Ross, and Collins "bought a pound of weed off of [Ross]." The transaction occurred in the backseat of Ross's vehicle shortly after midnight. Collins said Willrich and the child were present. Collins testified he then "went back with [King] to [King's] house and smoked." Collins and King discussed selling some of the marijuana Collins had just purchased, and King agreed to find a buyer. Around 6 p.m. on March 6, King contacted Collins and provided him with an address. Collins testified King and M.H. were waiting together at the location, and M.H. was behaving strangely. Shortly after they entered the property through a side gate, M.H. pulled out a gun and pointed it at Collins, instructing him to get on the ground. Collins complied, and M.H. took his backpack, which contained the marijuana. According to Collins, King said, "'F[-]ck this'" and ran out. Collins felt King had "set [him] up" to get robbed, prompting Collins to confront King at the barn later. Collins testified that he did not know who Berg was and that Berg had been shot inadvertently.

Prior to trial, Collins was charged with aggravated assault with a deadly weapon for shooting King and Berg. Collins pleaded guilty to the lesser-included offense of deadly conduct with a firearm. In exchange for his testimony at appellant's trial, the State agreed to enter into a deferred adjudication plea bargain agreement.

8

Collins testified that he wrote to appellant after he posted bond, and appellant wrote back to him. Appellant's letter to Collins was admitted at trial:

Jailen, here what's good, bro? Sorry it took so long for me to write back. . . . I [sic] been in here tripping. I go to trial on May the 20th, in 7 days, [and] [King] is coming to testify against me.

Look, bro, the reason I almost didn't write you back is because I likely feel like you're being selfish. You're facing a petty ass aggravated assault, [and] they're offering to cap it at 8. Do you know how fast I'd sign on that? The cold part is, you don't even have to take that if you'd just be honest [and] say what really happened. Hell yes [King] [is] taking the stand on you, and he's taking the stand on me too. What you did to him will be considered retaliation, [and] that's not an aggravated charge. They'll use you to testify on [King and Berg and] give you a low number. That's what you need to do.

Now, I'm helping you out by giving you the information you need, so now I need you to help me out. [King] is coming to take the stand on me [and] implicate me in a murder, as well as [M.H., Berg, and Woodard]. Fam, there's no way I'd get convicted without these niggahs [sic] taking the stand, so I'll need you to testify against their testimony. They're about to lie [and] act like they ain't know [and] like they had no idea of what was gonna happen, but like you told me, they had you buy from [Ross] the night before, then robbed you the next day at [Woodard's] house. You saw exactly who robbed you [and] those same two people killed [Ross]. That's what I need you for. Fam, they're tryna [sic] send me away for the rest of my life so f[-]ck these niggahs [sic]!

. . . .

If you don't show up to testify, I'll have no choice but to say what you told me about [King, Berg, and M.H.] to my attorney, who will put [Ross's] b[aby] m[omma] on the stand to confirm, so you may as well do it. Cuz [sic] if you do that, they can't testify against you!! So Imma [sic] have you subpoena[e]d to court[.] Just do the right thing fam. Ain[']t no way neither one of us should go down for this shit. [Illegible] got no evidence on either of us but the statements against us. You hold the key lil niggah [sic]. Tell [illegible] to write me, [illegible] got his info anymore.

Collins said he viewed the letter as a threat. "It made me feel that he was basically telling me if I didn't try to get him out of the situation that he was going to in a way blackmail me," explained Collins.

9

**5.      Sarah Strickland**

Strickland testified that she had just given birth to appellant's child and was still in the hospital when appellant was apprehended in March 2018. Appellant later asked her to write an affidavit declaring that he was with her on March 6. Strickland declined. Strickland stated appellant had written her several letters while he was incarcerated even after the two separated. One letter written by appellant to Strickland was admitted at trial:

> . . . . I found out your mom is the reason I'm here. But see, your mom should've never even known what happened in this case, not even a street name, cuz [sic] she didn't have cable to watch the news! So that leaves one person. I sure as hell don't talk to Stephanie about my criminal activities or any of my friend's criminal activities. But you know I speak of everything to you.
>
> I've always said you talk too much; it's your problem. Now look, I'm in here facing a life sentence because of you [and] ya [sic] mamma [and] you wanna [sic] feed me some lame ass excuse about being scared to go to jail? F[-]ck what my lawyer told you. What did I tell you? My lawyers fixin[g] get fired anyway. You always listen to what everybody else gotta say doe [sic]. Oh but "I got [child] to think about," but I can't say that cuz [sic] you took that privilege away from me by opening your mouth. And the way it seems to me, you've already given up hope on me. Instead of being here emotionally[,] you say, "I'll never talk to you again if you get life," [laughing my ass off], the way you're so insistent on me signing over a 20; I really feel like you are hiding something. Are you afraid of me Sarah? What did you do that you're so afraid of me for? [Laugh out loud], no worries. I'll find out.
>
> . . . .
>
> Your only redeeming factor is you writing the affidavit for me. [T]hat's the only way I'll ever get back with you. You can't get charged for writing an affidavit either. But that's the only alibi I have is being with you [and] if you ain[']t tryna [sic] say that no more, but you'd rather let me go to prison for life? Then f[-]ck you. I'll never get back with you [and] that's on all my dead relatives and on both my children's souls. God can strike me now if I'm lying, but Sarah, if you gonna be on this b.s., [ineligible] need you, you ain[']t the only one.

**B.      Jury Deliberations**

During jury deliberations, the jury released a note, which stated: "State's Exhibit No. 1 is an interview of the Defendant on 3/15/18. This, to our knowledge, was not shown at trial. Are we allowed to watch this DVD?" The State requested that the trial court send an instruction stating that the jury was only to consider the evidence admitted at trial. Defense counsel moved for a mistrial. The trial court notified the attorneys that it would be sending a response to the jury to inquire as to whether they had viewed the State's Exhibit. Following a brief recess, the trial court resumed on the record:

THE COURT:          Okay. The response to the question was, ["]We turned the video on, and we then saw the Defendant walk into the interrogation room. We then paused the video. We paused the video prior to questions being asked or the Defendant speaking. We realized that we hadn't seen the video before. We then subsequently asked the question. The Defendant had not sat down in the video before we paused it,["] signed the jury foreman.

[APPELLANT]:          Based on that response, Judge, I would reurge my motion for a mistrial. Not only have they gotten evidence that was never admitted in this trial but they have seen my client on the video knowing that he gave [a] statement, likely in handcuffs. And it would—I mean, it would unduly prejudice him. They have a piece of evidence that was never admitted, never even alluded to in the trial. So, we'd ask for a mistrial. There's no way to cure that. We can't send them a note back telling them to ignore that, ignore that, you know, that he gave a statement, and ignore what you saw. We can't unring that bell.

The trial court prepared and submitted a written response, instructing the jury to "disregard" anything "gleaned or determined from State's Exhibit 1" and to continue deliberations. Appellant's trial counsel objected to "any curative instruction" and requested a mistrial, which was promptly denied.

11

The jury returned a guilty verdict on the lesser-included offense of felony murder. Appellant was sentenced to sixty-five years' incarceration in the Texas Department of Criminal Justice, Institutional Division. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By his first issue, appellant argues the evidence was legally insufficient to support his conviction of felony murder.

### A.    Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the factfinder is the exclusive judge of the facts, the credibility of the

12

witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *See Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *Romano v. State*, 610 S.W.3d 30, 34 (Tex. Crim. App. 2020). The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Walker*, 594 S.W.3d at 336.

### 1. Accomplice Witness Testimony

"An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state." *Hernandez v. State*, 585 S.W.3d 537, 547 (Tex. App.—San Antonio 2019, pet. ref'd) (quoting *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011)). Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14.

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence—direct or circumstantial—that tends to connect the accused with the commission of the crime.

13

*Smith*, 332 S.W.3d at 442; *Hernandez*, 585 S.W.3d at 548–49. "[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The corroborating evidence must "simply link the accused in some way to the commission of the crime." *Id.* "[W]hen there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith*, 332 S.W.3d at 442. An appellate court may not offer "alternative, seemingly innocent explanations in certain instances [that are] in direct opposition to the jury's implicit determination in [the] case." *Id.*

### 2. Jailhouse Informant Testimony

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075. "Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated." *Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015). The standard for corroboration of jailhouse informant testimony under article 38.075 is the same as the standard for corroboration of accomplice-witness testimony under article 38.14. *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi–Edinburg 2011, no pet.); *see also Phillips*, 463 S.W.3d at 69–71 (concurring opinions by Keller, P.J. & Newell, J.) (noting that the parallel language of the accomplice-witness statute and the jailhouse informant statute indicates that the latter statute was designed to operate like the former).

14

### 3. Summation

Thus, a hypothetically correct charge here would instruct the jury to find appellant guilty of felony murder as authorized by the indictment if the State proved beyond a reasonable doubt that appellant, acting alone or together as a party, intentionally or knowingly committed or attempted to commit a robbery, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he committed or attempted to commit an act clearly dangerous to human life that caused the death of Ross. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 29.02; *Metcalf*, 597 S.W.3d at 856.

### B. Analysis

Appellant principally contends that the evidence was legally insufficient to convict him of felony murder because (1) the testimony from Woodard and Berg, his co-defendants, was uncorroborated; (2) Willrich and witnesses "only ever saw a single shooter"; (3) appellant's letter to Strickland was "at best, silent about the instant offense"; (4) appellant's DNA and fingerprints were not recovered from either of the vehicles; and (5) any testimony regarding a second shooter could have been a reference to Woodard or Johnson.

The non-accomplice and non-jail informant evidence in this case shows the following:

- Based on the autopsy findings and shell casings found at the scene, Ross was shot by two different weapons. While none of the witnesses were able to provide a description of the second shooter, Willrich and the DeLombas both confirmed the presence of a second shooter.

- Appellant's phone was at or near the scene of the murder around the time of the murder, and appellant's phone made over a dozen calls to a co-defendant shortly before and after the shooting.

15

- Two anonymous tips submitted through Crime Stoppers alleged appellant's involvement in the shooting; the latter tip provided identifying information for appellant.

- In a written letter, appellant sought an alibi from his ex-girlfriend. Appellant suggested he had been involved in illicit activity in connection with this cause—matters which he had confided in Strickland, who told her mother, who then contacted law enforcement, resulting in his arrest:

  > I sure as hell don't talk to Stephanie about my criminal activities or any of my friend's criminal activities. But you know I speak of everything to you . . . . I've always said you talk too much; it's your problem. Now look, I'm in here facing a life sentence because of you [and] ya [sic] mamma.

- Appellant also wrote to Collins, requesting that Collins testify favorably, or appellant would "have no choice but to" disclose what Collins had told him concerning Collin's aggravated assault offense. Although appellant, in his letter to Collins, states that "those same two people killed [Ross]," presumably in reference to King and M.H. robbing Collins, appellant insinuates his own involvement and his co-defendant's feigned ignorance: "They're about to lie [and] act like they ain't know [and] like they had no idea of what was gonna happen . . ."

On review, we defer to the jury's view of the facts and do not engage in a "divide and conquer" approach. *See Smith*, 332 S.W.3d at 442. The corroborating circumstantial evidence here "link[s] the accused in some way to the commission of the crime." *See Malone*, 253 S.W.3d at 257; *see, e.g., De La Fuente v. State*, 432 S.W.3d 415, 421–22 (Tex. App.—San Antonio 2014, pet. ref'd) (holding non-accomplice witness evidence that placed defendant at or near the scene of the murder, close in time to its commission, and in the company of a person charged as an accomplice to the murder was sufficient to corroborate accomplice-witness testimony). And, as such, it constitutes sufficient corroborating evidence to connect appellant to the commission of Ross's robbery and murder. *See* TEX. CODE CRIM. PROC. ANN. arts. 38.14, 38.075. Further, in considering all

16

the evidence presented to the jury, including the accomplice-witness and jailhouse-informant evidence, there is more than sufficient evidence to conclude that the State proved beyond a reasonable doubt that appellant, acting alone or together as a party, intentionally or knowingly committed or attempted to commit a robbery, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, committed or attempted to commit an act clearly dangerous to human life that caused the death of Ross. *See Phillips*, 463 S.W.3d at 66; TEX. PENAL CODE ANN. §§ 19.02(b)(3), 29.02. Thus, we hold the evidence is legally sufficient to support appellant's conviction. We overrule appellant's first issue.

### III. DENIAL OF MISTRIAL

By his second issue, appellant challenges the trial court's denial of his request for a mistrial urged after the jury watched a portion of an exhibit that had never been entered into evidence.

### A. Standard of Review and Applicable Law

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion, and we uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Archie v. State*, 340 S.W.3d 734, 738 (Tex. Crim. App. 2011). "'[We] view[] the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling.'" *Gonzalez v. State*, 608 S.W.3d 98, 107 (Tex. App.—San Antonio 2020, pet. ref'd) (quoting *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009)).

A mistrial is appropriate in extreme cases of highly prejudicial error when spending any further time or effort on trial "would be wasteful and futile." *Gonzalez*, 608 S.W.3d at

108 (quoting *Ocon*, 284 S.W.3d at 884). "A defendant is entitled to a mistrial if the jury, after retiring to deliberate, receives other evidence adverse to the defendant." *Bustamante v. State,* 106 S.W.3d 738, 743 (Tex. Crim. App. 2003). "In determining whether the evidence was 'received' by the jury, a court may consider how extensively the evidence was considered by the jury and whether the jury was given an instruction to disregard." *Id.*

## B.   Analysis

Jury deliberations were already underway when the trial court received a note indicating that the jury had an exhibit in its possession which had not been admitted at trial. After a brief conference with attorneys, wherein appellant's trial counsel moved for a mistrial, the trial court asked the jury whether it had viewed the exhibit. The jury replied:

> We turned the video on, and we then saw the Defendant walk into the interrogation room. We then paused the video. [W]e paused the video prior to questions being asked or the Defendant speaking. We realized that we hadn't seen the video before. We then subsequently asked the question. The Defendant had not sat down in the video before we paused it.

Defense counsel re-urged his motion for mistrial, additionally objecting to the trial court's proposed curative instruction to disregard the non-admitted exhibit.

The circumstances of this case are similar to those before the Texas Court of Criminal appeals in *Bustamante v. State*. 106 S.W.3d at 741. In *Bustamante*, after jury deliberations began, the jury sent out a note asking whether it could consider a witness statement that had never been admitted into evidence but that had accidentally been provided to the jurors in the jury room. *Id*. The Court concluded that an instruction to disregard during deliberations was comparable in effect to an instruction to disregard inadmissible evidence. *Id.* Moreover, because the jury recognized the problem and

18

awaited further instructions before continuing their review of the evidence, the evidence "was not 'received' by the jury and any error associated . . . was cured by the instruction." *Id.* at 744. Thus, the Court held that the trial court had not abused its discretion in denying Bustamante's request for mistrial. *Id.*

The record here supports a finding that, rather than reviewing the entire recording, the jury timely sought guidance from the trial court. The jury was further instructed, as it had previously been on multiple occasions, that it could consider only evidence that had been admitted at trial. There is no evidence in the record indicating that the jury was unable to follow the trial court's instruction. Thus, as in *Bustamante*, the trial court's curative instruction to disregard the unadmitted State's exhibit means that, in effect, it was never "received" by the jury. *See Bustamante*, 106 S.W.3d at 744; *Benton v. State*, 237 S.W.3d 400, 404 (Tex. App.—Waco 2007, pet. ref'd) (concluding the trial court did not abuse its discretion in denying appellant's motion for mistrial although the jury "may have viewed" images which were not admitted into evidence); *see also Boswell v. State*, No. 13-11-00785-CR, 2015 WL 5655823, at *3 (Tex. App.—Corpus Christi–Edinburg Sept. 24, 2015, pet. ref'd) (mem. op., not designated for publication) ("The trial court did not abuse its discretion in overruling appellant's motion for mistrial on the basis of the jury's receipt of other evidence."). As such, under the circumstances presented here, the trial court did not abuse its discretion by denying appellant's motion for new trial. We overrule appellant's second issue.

#### IV.    INEFFECTIVE ASSISTANCE

By his third issue, appellant contends that his attorney provided ineffective assistance of counsel when he failed to (1) "make an adequate record" after an

unidentified seated juror notified the trial court that he had gone to high school with a witness, (2) object when Saiz "raised a false impression that codefendants Berg and King could, and did, legally corroborate one another," and (3) object when "the State elicited both hearsay and testimonial hearsay."

## A. Standard of Review and Applicable Law

To prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that: (1) counsel's performance fell below the standard of reasonableness under prevailing professional norms; and (2) there is a reasonable probability that, taking into account the totality of the evidence before the judge or jury, the appellant was prejudiced by counsel's actions or inactions. *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018) (citing *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985) and *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). To demonstrate the first prong of deficient performance, the appellant must overcome the strong presumption that the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). The presumption of a sound trial strategy generally cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007) ("The lack of a clear record usually will prevent the appellant from meeting the first part of the *Strickland* test."); *Davis v. State*, 533 S.W.3d 498, 510 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). If there is any basis for concluding that counsel's conduct was strategic, then further inquiry is improper. *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

**B. Analysis**

**1. Juror Challenge**

Appellant first complains that his attorneys should have "subjected [the juror and witness] to some substantial adversarial testing" after a juror disclosed mid-trial that he had gone to high school with one of the witnesses.

Appellant references the following colloquy:

THE COURT: . . . . Hi, I asked that they bring you in because I understand you notified the deputy that you recognized a witness?

JUROR: Yes, ma'am.

THE COURT: Okay. And how do you recognize him, sir?

JUROR: High school.

THE COURT: High school?

JUROR: Yes, ma'am.

THE COURT: Did y'all have a relationship?

JUROR: No, ma'am.

THE COURT: Have y'all had a relationship since?

JUROR: No, ma'am.

THE COURT: Knowing him from high school, is that going to affect how you judge his credibility at all?

JUROR: No, ma'am.

THE COURT: Okay. So, you feel comfortable?

JUROR: I do. I just wanted to let you guys know just in case.

THE COURT: Okay. All right. Okay. Well, we appreciate that.

JUROR:                  Absolutely.

THE COURT:              Thank you. You can go ahead and release them for lunch.

The record is silent as to which witness the juror recognized, and the identity of the juror himself is unknown.

The record is additionally devoid of any explanation for why appellant's trial counsel did not seek elaboration: the record contains no motion for new trial on this basis,[14] an accompanying hearing, nor any affidavits. We decline to speculate as to why appellant's trial counsel decided not to engage in "substantial adversarial testing." *See Mata*, 226 S.W.3d at 430. "Consistent[] with *Strickland*, we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he 'made all significant decisions in the exercise of reasonable professional judgment.'" *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (quoting *Strickland*, 466 U.S. at 690) (concluding that a trial counsel's failure to challenge a venire member who had voiced his lack of impartiality did not constitute ineffective assistance); *see also Hernandez v. State*, No. 04-19-00888-CR, 2020 WL 7048684, at *3 (Tex. App.— San Antonio Dec. 2, 2020, no pet.) (mem. op., not designated for publication). Because the record in the instant case contains no evidence to rebut that presumption, appellant has not overcome the first prong of *Strickland*. *See Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696.

---

[14] In a motion for new trial, appellant exclusively asserted that he should be granted a new trial because "the jury received other evidence that was not admitted into evidence at trial."

22

## 2.     Objections to Detective Saiz's Testimony

Appellant next complains that his trial counsel should have objected to the following:

[STATE:]     You were talking to [Berg] in one room, and Detective Duke was talking to [King] in the other room?

[SAIZ:]     Yes.

[STATE:]     What is the purpose of two officers—of two interviews being conducted simultaneously?

[SAIZ:]     It allows us to verify the information they're giving us, compare stories so to speak, and we'll take breaks along the way to talk to each other. You know, what is this person telling you? This is what this guy is telling me.

[STATE:]     How important is it—what does it mean to you when two stories are going on separately but at the same time? How important is it to you that they corroborate each other?

[SAIZ:]     It's very important. It lends to their credibility. And we know they're telling us the truth.

Appellant specifically contends that the officer should not have "comment[ed] on the truthfulness of another witness at trial." However, the State's question, which appellant argues resulted in a statement on credibility bolstering, posed a hypothetical: "[W]hat does it mean to you when two stories are going on separately but at the same time? How important is it to you that they corroborate each other?" Detective Saiz's response of the State's hypothetical was likewise not a direct opinion on the veracity of the co-defendants in this case. Therefore, even had counsel objected, the trial court would not have committed error by overruling the objection. *See Gauna v. State*, 534 S.W.3d 7, 12 (Tex. App.—San Antonio 2017, no pet.) (providing that an appellant who claims ineffective

assistance based on a failure to object "must demonstrate that if trial counsel had objected, the trial court would have committed error by overruling the objection").

Moreover, as noted *supra*, the record is undeveloped in identifying what trial strategies, if any, were employed by trial counsel. *See id.* at 13. Accordingly, appellant has not shown that his counsel's conduct was so outrageous that no competent attorney would have engaged in it, and appellant has not overcome the first prong of *Strickland*.[15] *See Strickland*, 466 U.S. at 689; *Morales*, 253 S.W.3d at 696.

### 3. Objections to Berg's and Woodard's Testimony

Appellant next argues that his counsel erred in failing to object to the State's elicitation of Berg and Woodard's out of court statements in contravention to hearsay rules.[16] *See* TEX. R. EVID. 801, 802, and 803.

---

[15] Appellant also asserts a "testimonial hearsay" challenge in a single paragraph subsumed in this portion of his brief, but he does not specify which questions or responses he takes issue with concerning Detective Saiz's testimony, which spans more than fifty-pages in the record. We conclude this sub-issue has been inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

[16] Appellant specifically challenges the following lines of questioning:

[STATE:] And you were recorded—you were recorded when you were being asked these questions, right?

[BERG:] Yes, sir.

[STATE:] And when the detective first asked you if you had heard of [Ross], he asked you a couple of times. What did you say?

[BERG:] No, sir.

[STATE:] Why did you say you had never heard of him?

[BERG:] Because I didn't want to be a part of it.

[STATE:] Did you tell him another lie about your phone?

[BERG:] Yes, sir.

[STATE:] What did you tell him?

Appellant has not presented any argument about whether the trial court would have erred by overruling an objection to the State's line of questioning. *See Gauna*, 534 S.W.3d at 12*.* Additionally, because trial counsel's reasons for his conduct and tactical decisions do not appear in the record, there is at least the possibility that counsel's reasoning and conduct could have been legitimate trial strategy. *See Mata*, 226 S.W.3d at 430; *Delrio*, 840 S.W.2d at 447*.* Without more, we decline to second guess trial counsel's strategy, and we defer to his decisions. *See Lopez*, 343 S.W.3d at 143. We conclude appellant has not overcome the presumption that counsel's actions were motivated by sound trial strategy, the first prong of *Strickland*. *See id.*; *Vega v. State*, 610 S.W.3d 79, 86 (Tex. App.—San Antonio 2020, no pet.) (providing that appellant's complaint that his trial counsel failed to object to the State's hearsay witnesses fell under the presumption of trial strategy); *see also Pieper v. State*, No. 04-19-00377-CR, 2020

---

[BERG:]      I told him that somebody came in between the Cadillac and pointed a gun at me and told me to give it to him.

. . . .

[STATE:]     What—what else did you learn about the plans to make the play against [Ross]?

[WOODARD:]   I learned—

[STATE:]     What did they talk about?

[WOODARD:]   That [Ross] was going to meet us.

[STATE:]     Okay. Do you know where he was going to meet you?

[WOODARD:]   No. There wasn't no specific place of where he was going to meet us at.

[STATE:]     Okay. You just know that at some point that night you were going to meet [Ross]?

[WOODARD:]   Yes, ma'am.

WL 5646929, at *3 (Tex. App.—San Antonio Sept. 23, 2020, no pet.) (mem. op., not designated for publication) (explaining that an appellant bears the burden of rebutting the presumption of sound trial strategy with evidence).

We overrule appellant's third issue.

## V. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
10th day of June, 2021.